National Biscuit Co. *v.* Philadelphia, Appellant.

Argued June 1, 1953.   Before Stern, C. J., Stearne, Jones, Bell, Chidsey, Musmanno and Arnold, JJ. Appeals, Nos. 196, 214, 215, 216 and 219,

*Abraham L. Freedman,* City Solicitor, with him *Jerome J. Shestack* and *Abraham Wernick,* Deputy City Solicitors, and *Robert M. Landis,* First Deputy City Solicitor, for City of Philadelphia.

*Charles J. Biddle,* with him *Leslie M. Swope, George S. Munson, David J. Smyth* and *Frederick H. Spotts,* for plaintiffs, appellants (No. 216).

*Charles J. Biddle,* with him *Leslie M. Swope* and *W. Wilson White,* for plaintiffs, (Appeal No. 215).

*Philip Sterling,* with him *Sydney S. Stern* and *Sterling, Stern & Levy,* for plaintiffs, appellants, (No. 196).

*Henry S. Drinker,* with him *John A. Ballard, John Mulford* and *Leslie M. Swope,* for plaintiffs, appellants, (No. 219).

608

*Francis J. Myers, Joseph F. McVeigh* and *O'Brien & Myers,* filed a brief for Chamber of Commerce of Greater Philadelphia, under Rule 46.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, June 26, 1953:

The present appeals challenge the validity of an ordinance of December 9, 1952, of the City of Philadelphia and question its applicability to the various taxpayers involved in these proceedings.

It has become a mere platitude to state, what has so often been proclaimed, that courts are concerned, not with the wisdom of legislation, but with the right of the legislative body to enact it,—not with *policy* but with *power.*

The ordinance is entitled in part: "An Ordinance to provide revenue by imposing a mercantile license tax on persons engaging in certain businesses, including manufacturing, professions, occupations, trades, vocations, and commercial activities in the City of Philadelphia." It levies an annual tax on wholesale and retail dealers or vendors, manufacturers and all other persons engaged in business, at the rate of 3 mills on each dollar of the annual gross volume of business transacted. "Gross volume of business" is defined to mean, with certain exceptions, gross receipts, including both cash and credit transactions. "Business" is defined to mean "the carrying on or exercising for gain or profit within the City of Philadelphia of any trade, business, profession, vocation, or making sales to persons within the City of Philadelphia, or of any manufacturing, commercial or financial activity, service or business, including but not limited to manufacturers, brokers, wholesale dealers, or wholesale vendors, retail dealers or retail vendors"; it does not include any employment for a wage or salary. Every person desiring to engage in, or to continue to

engage in any business is required to procure a mercantile license for each of his places of business in the City, paying therefor a fee of $3 for each such place.

In the argument on these appeals an attack was made upon this legislation on the ground that the title of the ordinance is constitutionally defective and that the terms of the ordinance itself are vague and uncertain. Those criticisms, however, were apparently not seriously pressed, and, in any event, they do not merit serious discussion. Another complaint urged was that the ordinance does not limit itself to the scope of the usual mercantile license tax because, it is alleged, such taxes have "historically" been imposed only upon merchants, whereas this ordinance purports to tax also persons otherwise engaged. But, whether that fact be true or not, it is certainly wholly irrelevant because the sole question is whether the City has the power to impose the tax upon such "additional" persons and not whether preceding acts or ordinances have included them.[1] Moreover, the ordinance itself provides that if the tax, or any portion thereof, which it imposes shall be held by any court of competent jurisdiction to be in violation of any constitutional or statutory provisions, as applied to any person, such decision shall not affect or impair the right to impose the tax, or the validity of the tax so imposed upon other persons as therein provided.

[1] Incidentally it is of interest to note that the Acts of May 23, 1949, P. L. 1669, and May 10, 1951, P. L. 265, imposing a similar tax for the purpose of providing revenue for school districts of the first class, are in fact almost as broad as the present ordinance and define "business" and "financial business" in nearly the same language. Also, in the Pittsburgh mercantile license tax which was the subject of discussion in *Federal Drug Co. v. Pittsburgh*, 358 Pa. 454, 57 A. 2d 849, liability was extended even to persons conducting or operating places of amusement, including theatres, motion picture houses, billiard and pool rooms, baseball and football fields, and a large number of other such places.

Even if, therefore, it should be adjudged that the tax cannot validly be applied to any particular person or persons that would not affect or impair the validity of the ordinance as to those properly subject thereto. Accordingly, it is clear that the ordinance, as such, is a valid enactment, and that the only questions requiring consideration are those concerning its applicability to persons which it assumes to tax who are engaged in certain types of business, professions, occupations, and financial activities.

The Act of August 5, 1932, special session 1932, P. L. 45, being the so-called "Sterling Act," gave authority to the council of any city of the first or second class,[2] for general revenue purposes, to levy, assess and collect such taxes on persons, transactions, occupations, privileges, subjects and personal property, within the limits of such city, as it should determine, except that such council should not have authority to levy, assess and collect any tax on a privilege, transaction, subject or occupation, or on personal property, which then was or might thereafter become subject to a State tax or license fee. While, therefore, this statute vested in the council of the City of Philadelphia an enormously broad and sweeping power of taxation, that grant was attended by the important limitation that no tax could be thus imposed if it duplicated the State's own imposition of a tax or license fee.[3] Because of that limitation National Biscuit Company, one of the present appellees, claims exemption from the City tax because, as a corporation,

---

[2] The Act provided that as to cities of the second class it should remain in force only until June 1, 1935.

[3] Similar power was subsequently granted by the so-called "Tax Anything" Act of June 25, 1947, P. L. 1145, as amended, to the duly constituted authorities of certain other political subdivisions of the Commonwealth, but with somewhat greater limitations than those contained in the Sterling Act.

it pays annually to the Commonwealth a corporate net income tax under the Act of May 16, 1935, P. L. 208, as reenacted and amended, and, as a foreign corporation, a franchise tax under the Act of June 1, 1889, P. L. 420, as amended, and also, to the School District of Philadelphia, an annual tax on gross receipts under the Act of May 23, 1949, P. L. 1669, as reenacted and amended.

Household Finance Corporation, another of the appellees, claims exemption from the City tax because, as a corporation, it pays annually to the Commonwealth a corporate net income tax under the Act of May 16, 1935, P. L. 208, as reenacted and amended, and, as a foreign corporation, a franchise tax under the Act of June 1, 1889, P. L. 420, as amended.

Household Consumer Discount Company, another of the appellees, claims exemption from the City tax because, as a corporation, it pays annually to the Commonwealth a corporate net income tax under the Act of May 16, 1935, P. L. 208, as reenacted and amended, and, as a domestic corporation, a capital stock tax under the Act of June 1, 1889, P. L. 420, as amended. Both Household Finance Corporation and Household Consumer Discount Company also pay to the School District of Philadelphia an annual tax on gross receipts under the Act of May 23, 1949, P. L. 1669, as reenacted and amended.

The Philadelphia Saving Fund Society, the Western Saving Fund Society of Philadelphia, the Beneficial Saving Fund Society of Philadelphia, and Saving Fund Society of Germantown and its Vicinity, appellees, claim exemption from the City tax because they each pay to the Commonwealth an annual tax on their net earnings or income under the Act of June 1, 1889, P. L. 420, as amended. They also pay to the School District of Philadelphia an annual tax on gross receipts under

the Act of May 23, 1949, P. L. 1669, as reenacted and amended.

The court below held that because of these various payments all of these appellees were relieved from payment of the City tax. We are not in accord with this conclusion.

In the first place, as far as the payments made to the School District of Philadelphia are concerned, it is sufficient to say that in *McClelland v. Pittsburgh*, 358 Pa. 448, 57 A. 2d 846, we held that a tax imposed for the benefit merely of a local political subdivision, and not for general State purposes, is not to be regarded as a State tax within the meaning of that term in the "Tax Anything" Act of June 25, 1947, P. L. 1145, which, as previously stated, contained a limitation on the authority of the municipal legislative body similar to that embodied in the Sterling Act. This ruling was followed in *Federal Drug Co. v. Pittsburgh*, 358 Pa. 454, 57 A. 2d 849.

In the second place, as to the payments made to the Commonwealth of capital stock taxes, corporate net income taxes, foreign corporation franchise taxes, and taxes on net earnings or income, it need merely be pointed out that all those taxes have been held, many times, to be property taxes. In an opinion by Mr. Justice LINN, who cited many previous authorities so holding, the capital stock tax was again declared in *Murray v. Philadelphia*, 364 Pa. 157, 166, 71 A. 2d 280, 284, to be a tax on the property of the corporation, and so likewise (following *Blauner's Inc. v. Philadelphia*, 330 Pa. 342, 198 A. 889, and *Philadelphia v. Samuels*, 338 Pa. 321, 12 A. 2d 79) the corporate net income tax (p. 169, A. p. 286), the franchise tax (p. 170, A. p. 286), and (following *Kelley v. Kalodner*, 320 Pa. 180, 187, 181 A. 598, 601) a tax on net earnings or income (p. 175, A. p. 289). On the other hand, the authorities are equally

numerous to the effect that a mercantile license tax is not a tax on property or income, but an excise tax upon the privilege of transacting business measured by the gross volume of business annually transacted: *Knisely v. Cotterel,* 196 Pa. 614, 46 A. 861; *Commonwealth v. Harrisburg Light & Power Co.,* 284 Pa. 175, 130 A. 412; *Commonwealth v. Globe Furnishing Co.,* 324 Pa. 180, 188 A. 170; *Commonwealth v. McKinley-Gregg Automobile Co.,* 345 Pa. 544, 28 A. 2d 919; *Commonwealth v. Bailey, Banks & Biddle Co.,* 20 Pa. Superior Ct. 210; *H. J. Heinz Co. v. School District of Pittsburgh,* 170 Pa. Superior Ct. 441, 87 A. 2d 85. Since clearly, therefore, a mercantile license tax is not a duplication of any of the property taxes paid by appellees to the Commonwealth, the City of Philadelphia is not prohibited by reason of any limitation on its power contained in the Sterling Act from imposing such a tax on corporations otherwise subject thereto. Indeed it was definitely so decided in *Federal Drug Co. v. Pittsburgh,* 358 Pa. 454, 57 A. 2d 849, where the mercantile license tax imposed by an ordinance of the City of Pittsburgh was upheld; it was there concisely and categorically stated in an opinion by Mr. Justice ALLEN M. STEARNE, speaking for a unanimous court, that a mercantile license tax did not duplicate or conflict with either the corporate net income tax or the foreign corporation franchise tax. The court below was of the opinion that this holding in the *Federal Drug* case was overruled, or at least impaired, by the decision in the *Murray* case. Nothing could be further from the truth. The ordinance held invalid in the *Murray* case attempted to tax dividends received by persons on shares of stock in corporations paying these various property taxes, and it was held that, since such dividends represented merely a distribution of the net income of the corporation, a tax thereon was a *property* tax and therefore a duplication of the property

taxes paid by the corporation to the Commonwealth. What was held in the *Federal Drug* case was that, the mercantile license tax *not* being a property tax, it was *not* a duplication of the property taxes paid by the corporation. An analysis of the two cases makes this distinction entirely clear and there is not the slightest basis for the contention that they are other than in complete accord.

We hold, therefore, that corporations otherwise subject to the city mercantile license tax are not exempt therefrom by reason of the provisions of the Sterling Act merely because they pay property taxes to the Commonwealth. But these appeals require careful consideration of claims to exemption from the tax imposed by the City ordinance based on another reason than that heretofore discussed, namely, the payment to the Commonwealth of alleged "license fees," the Sterling Act providing that the council of the city shall not have authority to levy a tax on a privilege, transaction, subject or occupation "which is now or may hereafter become subject to a State tax or *license fee.*" The City earnestly argues that this prohibition should not be held applicable because, it alleges, the City had the power to impose a mercantile license tax under the wide authority granted it by the Act of August 25, 1864, P. L. 1030, which act, it is claimed, is still in force, and the Sterling Act gave the City no additional power in that respect; it is argued that the limitation contained in the Sterling Act on the City's authority to tax should be deemed applicable only to those powers given by the Sterling Act which had not previously existed, and therefore not to this mercantile license tax. We cannot subscribe to this proposition. Carried to its logical extreme, it would mean that the city could impose many other taxes even though they duplicated, not merely license fees, but revenue-producing taxes of the Com-

monwealth. While it may seem, from a practical stand-point, that the payment of a mere license fee to the Commonwealth ought not to be regarded as sufficient to preclude the City from imposing a mercantile license tax on the State's licensee, nevertheless the provision in the Sterling Act in that regard is explicit and unambiguous, and it is for the legislature alone to remove this limitation on the City's power if that body should determine that such action is desirable.

The real problem in this connection is to determine whether, in any given instance, a charge exacted by the State and designated as a "license fee" is really a license fee, because, as pointed out in *Flynn v. Horst*, 356 Pa. 20, 27, 29, 51 A. 2d 54, 58, the name given it by the legislature is not controlling. A true license fee is defined in *Pennsylvania Liquor Control Board v. Publicker Commercial Alcohol Co.*, 347 Pa. 555, 560, 32 A. 2d 914, 917, as "A charge which is imposed by the sovereign, in the exercise of its police power, upon a person within its jurisdiction for the privilege of performing certain acts and which has for its purpose the defraying of the expense of the regulation of such acts for the benefit of the general public; it is not the equivalent of or in lieu of an excise or a property tax, which is levied by virtue of the government's taxing power solely for the purpose of raising revenue." The distinguishing features of a license fee are (1) that it is applicable only to a type of business or occupation which is subject to supervision and regulation by the licensing authority under its police power; (2) that such supervision and regulation are in fact conducted by the licensing authority; (3) that the payment of the fee is a condition upon which the licensee is permitted to transact his business or pursue his occupation; and (4) that the legislative purpose in exacting the charge is to reimburse the licensing authority for the expense of the supervision and regula-

tion conducted by it. Therefore, even though the charge be labeled a "license fee," it cannot be regarded as such if, being merely nominal in amount and not apparently equated to the probable cost of supervision and regulation of the licensee's activities, it presumably was not legislatively intended to provide for such cost; in such a case it must be considered as merely a registration charge intended to cover clerical costs of the issuance of the license certificate and general office expenses, and in that event it does not, of course, prevent municipal taxation under the grant of power made in the Sterling Act.

Two cases decided by this court make the distinction entirely clear. One is *Pittsburgh Milk Co. v. Pittsburgh*, 360 Pa. 360, 62 A. 2d 49. The Milk Control Law of April 28, 1937, P. L. 417, stated the purpose of its enactment to be that of regulating and controlling the milk industry in the Commonwealth, for the protection of the public health and welfare, and for the prevention of fraud. It vested in the Milk Control Commission power to supervise, investigate and regulate the entire milk industry of the Commonwealth and provided that they could enter and inspect all places and equipment where milk or any product thereof was being produced, stored, processed or otherwise handled. It required all milk dealers to be licensed and it established license fees to be charged by the Commission for milk dealers on a yearly basis; these fees ran through an elaborately graded schedule from a charge of $1.00 if the dealer produced or brought within the Commonwealth during the year a daily average not exceeding 20 pounds of milk to a charge of $5,000 where such daily average exceeded 1,000,000 pounds. In the *Pittsburgh Milk Co.* case it was held that these were true license fees and that the appellee in that case, whose average daily quantity of milk was between 25,000 and 50,000 pounds, and who

paid a license fee for the year of $300.00, was therefore exempt from liability to the mercantile license tax of the City of Pittsburgh.

A different result was reached in the case of *Armour & Company v. Pittsburgh*, 363 Pa. 109, 69 A. 2d 405. There the Act of May 28, 1915, P. L. 587, as amended, is labeled, in part, an act to protect the public health by regulating and licensing the manufacture, handling, storage, sale and possession of meat and meat-food products. It provided for examinations by the Department of Agriculture of all establishments where meat-food products were prepared, stored or sold, or in which slaughtering or meat packing was carried on, and it required persons carrying on such operations to obtain an annual license and pay to the department at the time the application for registration and license was filed an annual fee of $10 for each establishment operated. We held that the fee thus exacted was not a *true* license fee within the meaning of that term in the "Tax Anything" Act of June 25, 1947, P. L. 1145. We said, pp. 113, 114, A. p. 407: "It would be wholly absurd to suppose that the charge of $10 imposed by the 1945 Act was intended by the legislature to constitute a license fee in the sense thus indicated, especially in view of the tremendous size of the industry involved and the elaborate inspections which its regulation requires. On the contrary, the charge is obviously one designed to cover merely the clerical expense of registration and issuance of the license certificate. It is of the same nature as the $1 permit fee imposed by the Cigarette Tax Act of May 13, 1947, P. L. 215, as to which we said, in Rice Drug Co. v. Pittsburgh, 360 Pa. 240, 244, 61 A. 2d 878, 880, that 'Clearly the imposition of this nominal charge was not intended to be an excise tax for the privilege of selling cigarettes.' It is of the same nature also as the annual fee of $2 for a mercantile license prescribed in section 3

of the Act of June 20, 1947, P. L. 745, imposing a mercantile license tax in school districts of the first class; that fee was to be paid to the receiver of school taxes or school treasurer, who was to issue the license upon receiving such payment.[4]  The fee provided for in the Milk Control Law of April 28, 1937, P. L. 417 was a *real* license fee, as we held in Pittsburgh Milk Co. v. Pittsburgh, 360 Pa. 360, 62 A. 2d 49, 52, which is the case relied upon by the packers; that fee was a graded one imposed upon milk dealers according to the average quantity of milk daily received or produced by them, ranging from a minimum of $1 to a maximum of $5,000, thus indicating that it was intended by way of reimbursement for the expense of supervision and regulation of the milk industry, the burden being placed upon the dealers in the proportions in which the magnitude of their respective business operations required such supervision.  The charge here in question is wholly different from the license fee thus exacted of the milk dealers, and we are clearly of opinion that the meat-packers are not entitled to exemption from the City of Pittsburgh mercantile license tax merely because of their $10 payments to the Department of Agriculture."

In view of these decisions and of the principles therein enunciated it becomes necessary, then, to consider separately the case presented in each of the present appeals to determine whether the fees paid by them to the Commonwealth fall within the *Pittsburgh Milk Co.* case or the *Armour & Co.* case,— in other words, whether the fees they pay are, or are not, true license fees within the meaning of that term in the Sterling Act.

---

[4] For this same reason the fee of $3 charged in the present City ordinance for each place of business procuring a mercantile license is obviously a mere registration charge designed to inform the City of the identity of those liable for the payment of the tax.

J. Alden Tifft et al., appellants in No. 196 January Term 1953, representing themselves, the members of the Insurance Agents and Brokers Association of Philadelphia and Suburbs, and all other insurance agents and brokers, are engaged in the business of insurance agents and brokers and are duly licensed as such under the Act of May 17, 1921, P. L. 789, as amended. The title of that act states, inter alia, that it is for the purpose of amending, revising and consolidating the law relating to the licensing and regulation of insurance agents and brokers. It provides for the licensing of both agents and brokers, prohibits certain transactions, misrepresentations and criminal acts on their part, gives the Insurance Commissioner power to examine the books and papers of the agents of any insurance company and, after hearing, to revoke the licenses of agents and brokers for cause. The Act of June 5, 1947, P. L. 445, empowers the Commissioner to examine and investigate the affairs of every person engaged in the business of insurance in order to determine whether such person has been or is engaged in any of the acts, methods and practices prohibited by the act, including unfair methods of competition and unfair or deceptive acts or practices in the conduct of such business. The Act of 1921, as amended, imposes a fee of $10 for individual insurance brokers and $25 for licenses in the name of a copartnership or corporation, including individual licenses for any duly qualified individuals without extra charge for officers or solicitors, not exceeding three; and a fee of $2 for an agent's license for each company.

In our opinion these charges assimilate the case to the *Armour* case, for it is difficult to conceive that the merely nominal fee of $2 exacted from an agent or of $10 from a broker, was intended to cover the entire probable cost of properly regulating the business of such agents and brokers—a regulation so necessary and so

extensive as that prescribed in the act. As the court below pointed out, the fee of $2 for the license of an agent is no more than that charged by the act for the issuance of any kind of a certificate. As the court further stated, the $2 and $10 charges are flat rates entirely unrelated to the licensees' volume of business, that "A license fee cannot be conjured up merely by aggregating a number of registration fees," and that "Manifestly there is no logical correlation between the number of insurance companies represented by an agent and the volume of business done by that agent." There is no relationship between the amount of the fee for each agent and the magnitude of his business operations which might require supervision. Nor is the question controlled by the fact that for certain years reported by the Commissioner the receipts in connection with the issuance of licenses to agents and brokers was in excess of the expenditures of the licensing division of the department and the regulation of such licenses. Such statistics will naturally vary each year depending upon the actual amount of regulation which the department may elect to carry on in that year and how much expense it may choose to incur for that purpose, and they throw no light upon whether it was the intention of the legislature in the 1921 Act to exact such charges for the purpose of meeting the cost of regulating the activities of the agents and the brokers. Moreover, while the amount of receipts, even at the rate of $2 and $10 respectively per license, naturally becomes larger as the number of licenses increases, with that increase the need of regulation, of course, increases proportionately; the determining factor is the *unit* fee imposed. We hold, therefore, that, as the court below correctly determined, the fees specified in the Act of 1921 for insurance brokers and agents are not "true" license fees which exempt them from liability under the City's mercantile license

tax. Nor is there any merit in appellants' reliance on the provision of the Act of May 3, 1915, P. L. 217, which made it unlawful for any municipality to impose a license fee upon insurance companies, agents, or brokers, authorized to transact business under the Act of June 1, 1911, P. L. 607. Mercantile license taxes, notwithstanding their appellation, are revenue measures and not "license fees" to cover the cost of the regulation of a business and without payment of which a business may not continue to operate. Moreover, the Act of June 1, 1911, P. L. 607, thus referred to, was repealed by the Act of May 17, 1921, P. L. 789, and therefore the provision of the statute relied upon by appellants has no present application.

National Biscuit Company, appellee in No. 214 January Term 1953, is engaged in the business of manufacture and sale of bakery products; as the operator of a bakery it is duly licensed under the Act of May 22, 1933, P. L. 912, as amended. The title of that act states, inter alia, that it is for the purpose of protecting the public health and regulating the inspection, maintenance and operation of bakeries and premises, stores and shops connected therewith, and the manufacture and sale of bakery products. It provides for the maintenance of clean and sanitary bakeries and for the purity and wholesomeness of bakery products. It gives to the Department of Agriculture permission to inspect bakeries and their operation, to forbid the continuance of any violations of the act, and to suspend or revoke the license issued to the bakery. It exacts an annual fee of $5 for bakeries using less than 100 barrels of flour per week, of $10 for bakeries using 100 barrels and less than 200 barrels of flour per week, and $20 for bakeries using 200 barrels or more of flour per week.

We are of opinion that the *National Biscuit Company* case is similar in nearly all respects to the *Armour*

case. Here, too, is an industry requiring extensive inspections, examinations and regulations involving the purity of food products. Here, too, it is difficult to believe that flat charges ranging from $5 to $20 per annum could have been legislatively intended to cover the cost of regulating the bakery industry. A maximum charge of $20 for a bakery with a minimum use of 200 barrels of flour per week irrespective of the magnitude of the volume of its business beyond that minimum, is far different than the fees charged in the *Pittsburgh Milk Co.* case ranging up to $5,000 a year. What has been said in regard to the license fees charged to insurance brokers and agents applies with equal force to this appellee, and we therefore conclude that National Biscuit Company is not exempted from liability under the City's mercantile license tax.

The Philadelphia Saving Fund Society, the Western Saving Fund Society of Philadelphia, the Beneficial Saving Fund Society of Philadelphia, and Saving Fund Society of Germantown and Its Vicinity, appellees in No. 216 January Term 1953, are corporations engaged in the business of conducting mutual saving funds. They are subject to the supervision of the Department of Banking of the Commonwealth under the Act of May 15, 1933, P. L. 565, as amended. That Act directs the Department of Banking to examine all such institutions at least once each year including a complete review of their property and the operation of their business, and for that purpose authorizes the Department to examine and investigate their books, papers and affairs. The Department may order them to cease any violation of law or the conduct of their business in an unsafe or unsound manner. Instead of exacting a "license fee" eo nomine, the act provides that all the expenses of the Department of Banking shall be charged to the institutions supervised by the Department in such equitable amounts as

the Department shall prescribe. The expenses incurred in connection with any examination or investigation, including a proportionate part of the examiner's salary and counsel assigned to the examination or investigation, may be assessed by the Department upon the particular institution examined or investigated; these expenses are prorated among the institutions on the basis of their respective total assets as of the end of the preceding year. Accordingly the four Saving Fund Societies, present appellees, pay annually, as their equitable proportions of the expenses of the Department of Banking and the actual cost of the examinations of their institutions, sums running into several thousands of dollars. In this instance, therefore, there can be no doubt but that these Saving Fund Societies do pay substantial fees, the legislative purpose in regard to which may well be assumed to be the defraying of the expense involved in the regulatory activities of the Department of Banking, since they are measured and determined by that expense. It is therefore our opinion that, by reason of the payment of such charges to the Commonwealth, these appellees are exempted from liability under the City's ordinance imposing the mercantile license tax.

Household Finance Corporation, appellee in No. 215 January Term 1953, is a foreign corporation engaged in the business of making small loans of $300 or less under authority of the Act of June 17, 1915, P. L. 1012, as amended, having 57 small loan offices in the State of which 14 are in the City of Philadelphia. The act provides that the Secretary of Banking shall at least once a year investigate the business and affairs of such corporations in order to ascertain the condition of their business and whether it has been transacted in accordance with law. Such a company must obtain a license from the Secretary of Banking as a condition upon which

it shall be allowed to transact its business, and for which it must pay a license fee of $100 annually on each of its places of business in the Commonwealth, and in addition the cost of every such examination and investigation of its business and affairs. The Secretary of Banking may, after hearing, revoke any license if the licensee shall violate any of the provisions of the act or fail to pay the cost of an examination.

The same considerations obviously apply in this instance as in the case of the Saving Fund Societies. Since appellee must pay for whatever expense is incurred by the State in its examinations and investigations of the affairs of the company, and this in addition to the fee of $100 annually for each of the company's places of business, which in itself is a substantial and not a mere nominal charge, it would seem clear that the sums thus paid are in the nature of true license fees, and therefore that this appellee is exempt from liability under the City's ordinance imposing the mercantile license tax.

Household Consumer Discount Company, appellee in No. 215 January Term 1953, a subsidiary of Household Finance Corporation, is a domestic corporation engaged in the business of making loans up to $2,000 under the Consumer Discount Company Act of April 8, 1937, P. L. 262, as amended; it has likewise 57 places of business in Pennsylvania including 14 in the City of Philadelphia. The act provides that the Secretary of Banking may at any time investigate the business and affairs of such companies and examine their books and records. In order to transact its business, appellee must obtain a license from the Secretary of Banking, for which it must pay an annual license fee of $100 for each place of business conducted by it. The act provides that all license fees received must be deposited in the State Treasury to the credit of the Banking Department Fund for the use of the Secretary of Banking in administering the act.

The cost of every examination of the company's business must be paid by the licensee so examined. The case of this appellee, therefore, is in every respect identical with that of Household Finance Corporation, and it is therefore similarly exempt from liability under the City's mercantile license tax ordinance.

Gerald W. Caner, et al., appellants in No. 219 January Term 1953, representing themselves and all other dealers in securities and investment advisers registered under the Pennsylvania Securities Act, and all other members of the Eastern Pennsylvania Group of the Investment Bankers Association of America similarly situated, are engaged in the business of dealing in securities and acting as investment advisers, and are duly licensed as such under the Act of June 24, 1939, P. L. 748, as reenacted and amended. The title of that act states, inter alia, that it is to provide for the registration and regulation of persons in the business of selling and buying securities or advising others as to the value of securities. It provides that dealers and their salesmen, and also investment advisers, must be registered annually in order to permit them to transact their business. There are provisions forbidding certain practices on the part of dealers, their salesmen, and investment advisers. The administration of the provisions of the act is vested in the Pennsylvania Securities Commission, upon whom the duty is imposed to see that the provisions of the act are at all times properly administered and obeyed, and to take such measures and make such investigations as in its opinion will or may detect the violation of any such provisions. The Commission is authorized, after hearing, to revoke the registration of any dealer, salesman or investment adviser if it has reason to believe that the law has been or is about to be violated, or if the dealer, salesman or investment adviser has been guilty of any fraud or fraudulent prac-

tice, or if the Commission has reason to believe that any registered dealer or investment adviser has become of bad repute, that his plan of business has become unfair, unjust or inequitable, that it is being conducted in an unfair, unjust or equitable manner, or that he has become of insufficient financial responsibility to deal with the public. The Commission may at any time make examinations of the books, securities and records of any dealer or investment adviser. The Commission is directed to charge as fees the sum of $10 for the filing of applications for licenses,—evidently a charge merely for the clerical service—$60 for each registration certificate of a dealer or investment adviser, and $15 for each registration certificate of a salesman. In accordance with that schedule appellants, who employ 29 salesmen, paid to the Commission in the year 1952 the sum of $660.

In the light of the facts thus recited we conclude that the payments thus exacted of these appellants by the Commonwealth are real "license fees" within the meaning of the Sterling Act. They are substantial in amount and are imposed as a condition upon the right of the appellants to conduct their business. It is to be noted that dealers are obliged to pay, in addition to their own registration fee, the sum of $15 for every salesman employed by them, and it is reasonable to suppose that the magnitude of the business of such a dealer, and therefore the amount of regulation and examination of his business required, is in likely proportion to the number of salesmen he employs. There would seem in this instance little room for doubt but that the legislative purpose of the fees thus imposed was to reimburse the Commonwealth for the expense of regulating and examining the business and affairs of the licensees. While the charges are designated in the act as being imposed for "registration certificates," such nomenclature, as previously stated, is of no moment, since it is the

nature and apparent purpose of the charge which controls its classification. We hold, therefore, that these appellants are exempt from liability under the City's mercantile license tax.

## ORDER

In Appeal No. 214 January Term 1953, the decree of the court below is reversed at the cost of appellee.

In Appeals Nos. 215 and 216, the decree of the court below is affirmed at the cost of appellants.

In Appeal No. 196, the decree of the court below is affirmed at the cost of appellants.

In Appeal No. 219, the decree of the court below is reversed at the cost of appellees.

---

OPINION BY MR. JUSTICE ALLEN M. STEARNE, CONCURRING IN PART AND DISSENTING IN PART:

I concur in the illuminating opinion of the Chief Justice as to the validity of the ordinance. The sole concern of this Court is the *power* of the City Council to make and enforce enactments. With the wisdom of the ordinance we are not judicially concerned.

I dissent, however, in Appeal No. 196 of J. Alden Tifft et al., Insurance Agents and Brokers. The Act of May 17, 1921, P. L. 789, as amended, 40 PS 1 et seq., empowers the Insurance Commissioner to examine and investigate the affairs of every person engaged in the business of insurance. Section 211 of that Act, 40 PS 49, imposes a fee of $10. for insurance brokers and $25. for license in the name of a copartnership or corporation, and a fee of $2. for an agent's license for each company. I disagree with the majority conclusion that because the individual charges are relatively small, this charge is not a "true license fee". The report of the Insurance Commissioner discloses that in the biennial period of 1949 and 1951 the amount of the agents' and brokers' licenses amounted to $836,923.27, while the

total of the expenditures of the entire insurance department during that period amounted to $1,147,533.97. Such large figures, to my mind, demonstrate that the gross amount was intended to and did cover almost the entire probable cost of properly regulating the business of such agents and brokers. As stated in the majority opinion: "While it may seem, from a practical standpoint, that the payment of a mere license fee to the Commonwealth ought not to be regarded as sufficient to preclude the City from imposing a mercantile license tax on the State's licensee, nevertheless the provision in the Sterling Act in that regard is explicit and unambiguous, and it is for the legislature alone to remove this limitation on the City's power if that body should determine that such action is desirable." I would reverse the decree of the court below and hold that such insurance agents and brokers are exempted from liability under the ordinance in question.

I also disagree with the ruling that the fees exacted of bakeries under the provisions of the Act of May 22, 1933, P. L. 912, as amended, 43 PS 403 et seq., are not true license fees. The distinction between amounts which are merely designed to cover the cost of registration and those which are true license fees intended to defray a substantial portion of the cost of regulation was first introduced into our law in *Rice Drug Company v. Pittsburgh*, 360 Pa. 240, 61 A. 2d 878, wherein we said (p. 243, 244): "There is no merit in appellant's contention that the payment of a fee of One Dollar under the State Cigarette Tax Act, in order to secure a permit to sell cigarettes, is a payment for the privilege of selling cigarettes, wherefore the City mercantile tax duplicates the State tax. Obviously the legislature intended, by the use of these words, to inform the Commonwealth of the identity of the sellers of cigarettes who would be liable for the payment of the tax. Clearly the imposition

of this nominal charge was not intended to be an excise tax *for the privilege of selling* cigarettes." On the same day we handed down our opinion in *Pittsburgh Milk Company v. Pittsburgh,* 360 Pa. 360, 62 A. 2d 49, in which we decided that the payments made by milk companies under the Milk Control Law of April 28, 1937, P. L. 417, as amended, 31 PS 700j-101 et seq., were real license fees which precluded imposition of the Pittsburgh Mercantile Tax.

Our most recent decision on this point is *Armour and Company v. Pittsburgh,* 363 Pa. 109, 69 A. 2d 405. We there decided that the Act of May 28, 1915, P. L. 587, as amended, 31 PS 461 et seq., which required meat packers to pay a flat fee of $10. for each establishment, imposed a mere registration charge. Mr. Chief Justice (then Justice) STERN distinguished the milk control fees by saying (p. 114) : ". . . *that fee was a graded one* imposed upon milk dealers according to the average quantity of milk daily received or produced by them, ranging from a minimum of $1 to a maximum of $5,000, thus indicating that it was intended by way of reimbursement for the expense of supervision and regulation of the milk industry, the burden being placed upon the dealers in the proportions in which the magnitude of their respective business operations required such supervision." (Italics mine)

It thus appears that the controlling consideration in each case was the intent of the Legislature: did it intend the fee to cover only registration costs or the expense of regulation as well? We have thus far recognized two indicia of this intent: a) Is the fee so small that it could not possibly defray the expense of regulation; and b) is the fee *graduated* so that large companies requiring greater regulation pay more?

It seems to me that the application of these two tests requires a conclusion that the bakeries pay *"real"* license

fees. The graduated amounts range from five to twenty dollars annually depending upon the quantity of flour used weekly. These fees have aggregated approximately $23,000.00 in each of the three fiscal years 1950, 1951 and 1952. Neither the City nor appellants have given us any estimate of the cost of regulation to the Commonwealth, and it would be pure speculation for us to attempt to guess what relationship the sum collected bears to the sum expended. But it is clear that $23,000 would pay for a great deal of registration.

The second test of legislative intent mentioned above is more helpful in the present instance. The Legislature has established some difference in fees paid depending on quantity of business done. I do not believe that we should introduce further uncertainty into this field of the law by reaching a different result from that in the *Pittsburgh Milk* case, supra, by recognizing a difference in degree of graduation of the tax. The important thing is that the Legislature has made some attempt to correlate the size of the fee to the cost of regulation. *This is enough to indicate an intent to impose a real license rather than a registration fee.* It is immaterial that the fees exacted may not cover the entire cost of regulation. I therefore dissent in Appeal No. 214.

While the authority of this Court is so circumscribed, speaking for myself alone, I have the temerity to suggest the dire consequences which, in my opinion, are certain to follow the enforcement of this ordinance. It superimposes upon an already heavy property tax what is termed a "mercantile license tax", i. e., an excise tax, for the privilege of doing business and practicing professions, occupations, etc. within the City. Such tax is imposed ". . . *on persons engaging in certain businesses, including manufacturing, professions, occupations, trades, vocations, and commercial activities. . .*". The scope of the tax is so inclusive that it approaches

the ancient Domesday Book, of which it has been said that it was so named because, like the day of doom, it spared no one. The only limitation imposed upon the City by the Sterling Act (August 5, 1932, P. L. 45, 53 PS 4613 et seq.) was that City Council could not tax objects which were or thereafter might become "subject to a State tax or license fee". It is a matter of judicial knowledge that every city and town in the Commonwealth is presently suffering from an anti-urban trend. The imposition of the present and proposed taxes will unquestionably accelerate a further mass *commercial, corporate and vocational* anti-urban escape from taxation.

The Act of 1947, facetiously termed the "Tax *Anything* Act", granted to all other political subdivisions in the Commonwealth the same taxation authority that the Sterling Act conferred on Philadelphia. It is reasonable to suppose that this ordinance, which is now validated, will immediately be followed by all other political subdivisions. The "Tax Anything Act" will then surely be known as the *"Tax Everything Act"*. If such taxation is thus extended throughout the Commonwealth, there will be a speedy general exodus of business *from the Commonwealth*. Such tax ordinances and enactments will not prove, I am certain, the anticipated tax "horn of plenty", but on the contrary will result in the opening of a Pandora's box releasing economic ills which cannot be recaptured, to the irreparable injury to the City and the Commonwealth.

For these reasons, while I feel impelled to concur in the *validity* of the ordinance, I venture the suggestion that if the City persists in enforcing this ordinance as now written, there should be appropriate legislation limiting the broad powers now possessed by the municipality.

OPINION BY MR. JUSTICE BELL CONCURRING IN PART AND DISSENTING IN PART:

The Sterling Act prohibits the City of Philadelphia from levying or collecting "any tax on a *privilege, transaction, subject,* or occupation or on personal property which is now or may hereafter become subject to [1] a state tax or [2] a *license fee.*"*

The Chief Justice has ably expounded the law with respect to the meaning of the words "license fee" as used in the Sterling Act. I agree with his construction of this license fee prohibition and of the application thereof to the cases of *The Philadelphia Saving Fund Society, The Western Saving Fund Society, The Beneficial Saving Fund Society,* and *The Saving Fund Society of Germantown; Household Finance Corporation, Household Consumer Discount Company, Caner, et al., Tifft, et al.,* and *National Biscuit Company.* However, I disagree with the majority opinion so far as it deals with corporations which pay to the State of Pennsylvania a corporate net income tax.

As recently as 1950 this Court flatly and unanimously decided in *Murray v. Phila.,* 364 Pa. 157, 71 A. 2d 280, that the Sterling Act prohibited Philadelphia from levying a tax on the net profits or net income of (every person, including) a corporation, domiciled in Philadelphia because the State taxed (when we look beneath the form and surface to the substance, i.e., to the realities) the net income of a corporation. We there said: "In construing the Act, it is immaterial that state taxes have been referred to as excise or franchise taxes or by any other adjective; *the reality controls. The fact that this tax* [the corporate net income tax] *is paid to the state conclusively shows that the city has no jurisdiction to tax the corporate income.*"

---

* Italics throughout, ours.

In 1953 (when we look beneath the form and surface to the substance or realities) we find that the present Philadelphia Ordinance unquestionably and without the slightest doubt taxes the gross (or in the alternative, the net) income of a corporation; but because the ordinance calls the tax by a different name, *the same tax* that was declared invalid 3 years ago is now sustained by a majority of this Court. How unrealistic can we be?

But even if we close our eyes to reality and assume that this Philadelphia Ordinance does not, in reality and in its operations and practical effect, impose an income tax on corporate income, but merely an "excise" tax for the privilege of doing business (measured by the corporate income) the City is still prohibited because, irrespective of what the City tax is called or is determined to be, *it is a replica of* and identical with the corporate net income tax and consequently taxes the *same "privilege"*, i.e., the privilege of doing business in Philadelphia, *and the same subject*, i.e., *corporate income*, as the State does. This fundamental fact was overlooked by the majority opinion which became enmeshed in attempting to distinguish "excise" taxes from "property" taxes, and fell into the basic error of adopting and applying one test for the Act, i.e., the "realities" test, and an entirely different test, i.e., the nomenclature test, for the Ordinance.

In order to determine whether the City is attempting to tax a "privilege" or a "subject" which has already been taxed by the State and is therefore prohibited, we must first examine the legislative intent as disclosed by the Sterling Act, the Corporate Net Income Tax Act, and by the City Ordinance.

The Corporate Net Income Tax Act by its very terms is "An Act to provide revenue . . . *by imposing an excise tax* . . . on the net *income* of certain corporations . . . ."

What for? *". . . for the privilege* of doing business in this Commonwealth." The City Ordinance by its very terms is "An Ordinance to provide revenue by imposing a mercantile license [excise] tax on persons . . . any individual, partnership, association or corporation engaging in certain businesses including manufacturing, professions, occupations, trades, vocations, . . . ." What for? For the privilege of doing business in Philadelphia. What is the tax imposed? *". . .* on the gross receipts [gross income] of persons, including certain corporations, engaging in certain businesses in the City of Philadelphia." If, so far as corporations are concerned, that isn't a duplication of both "privilege" and "subject", each of which is banned by the Sterling Act, then the word "duplication" no longer has any meaning in our language.

The Ordinance, which it is frankly admitted is intended to produce $17,000,000. annually, further provides, in imposing a 3 mills tax on each dollar of the annual gross volume of business, that " 'Gross Volume of Business' means *gross receipts* and shall include both cash and credit transactions. . . . or . . . In the Alternative at the option of the [taxpayer] at the rate of two (2) per centum of the annual gross volume of business transacted by such person *less the cost of goods and less the cost of labor . . . .*" This unquestionably means in the case of a corporation, 3 mills on the corporate gross income or 2% of *the corporate net income.* When it is realized that this tax is imposed upon virtually every person, partnership, manufacturer, profession, trade and corporation engaged in business in Philadelphia, it is clear to every layman and, I believe, to every careful analyst, that the tax is in reality and actuality not a genuine mercantile license tax, but a *gross income tax* (or, in the alternative, a net income tax) *on* individuals and *corporations* engaged in business in Philadelphia.

The words "mercantile license tax" are obviously a misnomer. If the City frankly, openly and undisguisedly imposed a tax on corporate gross or net income, but called it a mercantile license tax, could anyone justifiably contend that such a tax was not prohibited by the Sterling Act and by *Murray v. Phila.*, 364 Pa., supra? Yet that, in effect and in reality, is exactly what the City has done in and by its present ordinance.

*Murray v. Phila.* reiterated the law that "the *practical operation of the two taxes is controlling*"; and the city's power to tax must be strictly construed against the city. Nevertheless, the majority opinion, after holding that the corporate net income tax, in spite of calling itself an "excise" tax, is in reality a "property" tax, completely ignores the aforesaid legal principles and holds that the City tax which uses identical language with the Act is an "excise" tax and is not a tax on the income of a corporation. I repeat: How unrealistic, how impractical can we be?

Let's examine a little more closely just what the Philadelphia Ordinance attempts to tax and what is the practical operation of this City tax upon corporate income. The Ordinance first "apes" the historical mercantile license tax by taxing dealers and vendors at the rate of 3 mills on their gross volume of business or *gross receipts,* which are defined to be one and the same. It then immediately shows its real nature and true colors by taxing every manufacturer, every corporation, and, with a few exceptions, every person engaged in business in Philadelphia 3 mills on the annual gross (receipts or) income, or in certain cases alternatively, 2% on their net income. This is not a real or true or genuine mercantile license tax on vendors, dealers or merchants for the privilege of selling goods, wares or merchandise or engaging in kindred businesses as are most, if not all, of the genuine mercantile taxes imposed by municipal-

ities under the "Tax Anything Act". This is, we repeat, in reality and in its practical operations and effect, a thinly disguised gross (or, in the alternative, net) tax on income of (inter alia) corporations falsely and ingeniously masquerading as a mercantile license tax. Labeling poison as chocolate does not and will not make it chocolate. Nomenclature, labels and technical distinctions are of relatively little weight in determining what a tax really is; *realities control the determination*: *Murray v. Phila.*, 364 Pa., supra; *Arrott's Estate*, 322 Pa. 367, 185 A. 697; *Armour & Co. v. Pittsburgh*, 363 Pa. 109, 69 A. 2d 405. This corporate income is exactly what the majority say is taxed by the State in the Corporate Net Income Tax and this is specifically what is specifically prohibited in and by the Sterling Act: *Murray v. Phila.*, 364 Pa., supra.

The majority opinion assumes that this City tax is a real mercantile license tax in spite of the fact that it taxes nearly every man, woman, child, profession, partnership and corporation doing business in Philadelphia, and asserts that such a tax is technically *an excise tax,* and the corporate net income tax is technically *a property tax* and therefore there is no duplication. Whether we approach this question from a technical or a non-technical point of view is immaterial, for irrespective of whether the corporate net income tax is denominated or is held to be an excise tax or a property tax, if the Commonwealth imposes a tax on a corporation for the privilege of doing business, the City is prohibited from imposing a tax on a corporation for the privilege of doing business, or if the State imposes a tax on the same (property or) subject which the City attempts to tax, i.e., income of a corporation, the City's tax is clearly and specifically prohibited by the Sterling Act.

The only distinction between the Act and the Ordinance is that the City's measuring-rod or tax is *gross* as

distinguished from *net* income of corporations. This does not constitute a distinction in the privilege or subject or nature of the tax, but merely makes the tax more onerous and unjustifiable. A study of the Act and of the Ordinance demonstrates that they are twin brothers; and whatever the corporate net income tax is determined to be, *the City tax is exactly the same.*

When the legislature prohibited Philadelphia from taxing any *"privilege"* or any *"subject"* which was taxed by the State, in order to preserve the sources of the State's income, they were not talking Greek—they were not thinking of what was or was not an excise tax, or what was or was not a property tax which even this Court cannot consistently determine—they were talking plain, clear English which every member of the legislature and at least every layman could understand. When the Supreme Court vacillates from one case to another as to whether the corporate net income tax is an excise tax or a property tax, it would seem unreasonable to hold that the legislature was referring to these taxes when it used the words "privilege" or "subject".

The majority opinion says that the corporate net income tax* and capital stock taxes and taxes on net earn-

---

* So far as corporate net income tax is concerned, this Court more frequently held that it was an excise tax for the privilege of doing business in Pennsylvania. See: *Com. v. Curtis Publishing Co.*, 363 Pa. 299, 69 A. 2d 410; *Turco Paint & Varnish Co. v. Kalodner*, 320 Pa. 421. 184 A. 37; *Com. v. Warner Bros.*, 345 Pa. 270, 27 A. 2d 62; *Com. v. Electrolux Corp.*, 362 Pa. 333, 67 A. 2d 105; *Com. v. Bayuk Cigars Co.*, 345 Pa. 348, 28 A. 2d 134; *Com. v. Columbia Gas & Elec. Corp.*, 336 Pa. 209, 8 A. 2d 404. The distinction or line of demarcation between a privilege tax, an excise tax and a property tax, which in the last analysis must be determined by the incidents and the nature and legal effect of the Act rather than by the name by which it is described, is so nebulous, flexible and fluctuating, that the decisions on this point throughout the entire

ings have been held many times to be property taxes. This Court in the very recent case of *Murray v. Phila.,* 364 Pa. (1950), without overruling or even discussing the cases which held to the contrary, decided that the corporate net income tax is a "property" tax; and that the Philadelphia Ordinance which *imposed, openly and without subterfuge, income taxes* on various persons and corporations in Philadelphia was *invalid* because it was prohibited by the Sterling Act. This Court could reach such a conclusion only by looking below the surface into the "realities". Looking at the realities, this Court squarely decided, inter alia, that under the Sterling Act the City of *Philadelphia has no power (a) to tax the income of a domestic corporation* which pays a capital stock tax or a corporate net income tax to the state; or (b) to tax the income of a foreign corporation which pays a franchise tax to the state, because a franchise tax is the equivalent of a capital stock tax for domestic corporations; or (c) to tax the net income of a credit union; or (d) even to tax a dividend in the hands of a shareholder which was received from a corporation which pays corporate net income taxes to the state; or which was received from a foreign corporation which pays a franchise tax to the state, or which was received from a state bank or a national bank; and (e) has no power to tax income from bonds in the hands of a bondholder which was received from a corporation which pays a corporate loans tax to the state; and (f) has no power to tax income from real estate.

It clearly follows, if the realities of the Philadelphia tax are analyzed and carefully considered, that the City's so-called mercantile license tax is in reality and in its operation and practical effect, not a mercantile

country are ofttimes vacillating, confused and contradictory. See: 53 C.J.S., Licenses, pp. 457-461.

license tax, but a tax upon the income of every person and every corporation engaged in business in Philadelphia and as to said corporations is absolutely invalid.

The effect of the majority opinion will, in my judgment, open wide the door to many taxes which have heretofore been held invalid and will make meaningless and nullify many of the provisions of the Constitution. For example, if the Constitution or a statute prohibits the taxing of a particular subject, all a municipality or a legislature has to do is to call the tax a mercantile license tax or an excise tax and then measure it by the prohibited subject. Could anything show more clearly the basic weakness of the majority opinion or the dire results which can flow therefrom?

Mr. Justice MUSMANNO joins in this Opinion.