Honorbilt Products, Inc. *v.* Philadelphia, Appellant.

Argued January 12, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Jerome J. Shestack,* First Deputy City Solicitor, with him *Mitchell S. Lipschutz,* Assistant City Solicitor, *Abraham Wernick,* Deputy City Solicitor, and *Abraham L. Freedman,* City Solicitor, for appellant.

*Bernard Wolfman,* with him *Marvin Katz,* and *Wolf, Block, Schorr & Solis-Cohen,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, March 14, 1955:

The plaintiff, Honorbilt Products, Inc., brought an action in assumpsit to recover from the defendant, City of Philadelphia, the sum of $5,191.51, representing taxes and penalties for the year 1953 alleged to have been illegally collected by the City under its Mercantile License Tax Ordinance of December 9, 1952, as amended. The ordinance imposed a tax of 3 mills on the gross volume of business transacted within the city by the taxable. The City filed an answer denying liability, and by stipulation the case was heard by the court without a jury on the complaint, answer and depositions. Judgment was entered for the plaintiff in the amount of its claim and the City appeals therefrom.

The facts essential to the determination of the controversy are not in dispute. Plaintiff, whose business is conducted in Philadelphia, manufactures for sale mattresses and upholstered box springs. Its business is regulated and supervised by the Bedding and Upholstery Division of the State Department of Labor and Industry under the Bedding and Upholstery Act of May 27, 1937, P. L. 926, as amended, 35 PS §972 et seq. This Act, designed to protect the public from unsanitary bedding and upholstered products and to compel the manufacturer to disclose to the consumer the nature of the ingredients used in his products by Section 8(a), makes it illegal to sell or have in one's possession for the purpose of selling, mattresses, upholstered box springs and kindred articles unless an adhesive stamp prepared and issued by the Department of Labor and Industry is affixed to a tag which, in turn, must be attached to the mattress or spring. The tag must state the kinds of materials used in filling the article, the approximate percentages when mixed, and the number of the sterilizing and disinfecting permit issued by the Department where such a process is engaged in. Section 6 of the Act makes this permit a prerequisite to such processing. Under Section 8(c) the adhesive stamps must be purchased from the Secretary of Labor and Industry in quantities of not less than one thousand at a charge of $15 per thousand. Plaintiff's manufacturing operations necessitate the use of a sterilizing and disinfecting process, for which it must obtain the permit mentioned at an initial fee of $25 and an annual renewal fee of $5. The plaintiff has paid these charges and also the fees for the stamps required to be affixed to its products. Payments of the latter made by the plaintiff to the Commonwealth amounted to $1,000 in 1952 and $1,200 in 1953. The Commonwealth's total receipts from payments for the stamps required by the

Act were $109,420 in 1952 and $125,415 in 1953. Its total receipts for processing permits were $1,194 for 1952 and $2,796 for 1953. The total cost of administering the Act and the authorized regulations adopted thereunder was $60,480 in 1952 and $67,022 in 1953. A breakdown of the last mentioned figures shows that but a small percentage of the cost of the Department's operation was allocable to clerical and general office expenses and that the remaining expenditure was for regulation and inspection of those amenable to the Act. Field representatives of the Department conduct inspections of sterilizing and disinfecting processes employed, for the sampling of materials which are subjected to chemical analysis, and for prosecution and imposition of criminal penalties prescribed by the Act for violation of its provisions or the regulations promulgated by the Department. Each inspection takes from one to eight hours. Every manufacturer of mattresses and upholstery products is inspected more than once a year. Plaintiff was visited by inspectors seven times during 1952 and 1953. The overwhelming bulk of mattresses, pillows and upholstered products is inspected at one stage or another before reaching the ultimate consumer.

The basis of plaintiff's action is that the City had no power to impose upon it the tax in question because the "Sterling Act" (Act of August 5, 1932, P.L. 45, 53 PS §4613) prohibits the City from levying a tax on a privilege, transaction, subject or occupation ". . . which is now or may hereafter become subject to a State tax or license fee. . .", and that the fees it paid for stamps under Section 8(a) of the Bedding Act constitute license fees imposed by the Commonwealth. The City's position is that the stamp fees are not true license fees and even if considered such there is no duplication of tax under the "Sterling Act" because the impact of the

City tax falls upon a different area than that encompassed by the State Act.

In *National Biscuit Co. v. Philadelphia*, 374 Pa. 604, 98 A. 2d 182, this Court held that in view of the prohibition in the "Sterling Act", the Philadelphia Mercantile License Tax could not be imposed on concerns which paid real license fees to the Commonwealth, and set forth the elements of a true license fee. At page 615 Chief Justice STERN stated: ". . . The distinguishing features of a license fee are (1) that it is applicable only to a type of business or occupation which is subject to supervision and regulation by the licensing authority under its police power; (2) that such supervision and regulation are in fact conducted by the licensing authority; (3) that the payment of the fee is a condition upon which the licensee is permitted to transact his business or pursue his occupation; and (4) that the legislative purpose in exacting the charge is to reimburse the licensing authority for the expense of the supervision and regulation conducted by it. . .". Thus tested, we think that the fees paid for stamps required to be affixed to plaintiff's products under Section 8(a) of the 1937 Bedding and Upholstery Act are license fees which fall within the purview of the "Sterling Act".

The Act of 1937 is a successor to and replaced the Act of June 14, 1923, P.L. 802. The earlier Act of 1923 which sought to regulate the industry, contained, inter alia, an absolute prohibition in the use of shoddy in the manufacture of mattresses, pillows and kindred products. This prohibition was held by the Supreme Court of the United States violative of the Due Process Clause of the Fourteenth Amendment: *Weaver v. Palmer Brothers Company*, 270 U. S. 402, but the Court upheld the Commonwealth's inherent right under its police power to reasonably regulate the indus-

try as a sanitary measure in protection of the public health. The Act of 1937 which contained no such absolute ban, resulted, and its constitutionality has not been questioned. It is clear that the Commonwealth's power to regulate the bedding and upholstery business and to charge for the cost of such regulation derives from its police power and not from its taxing power. The fees paid for stamps under Section 8(a) of the Act are imposed only on those who are subject to the regulation of the Act, and the first and second "features" of a license fee as defined in the *National Biscuit Company* case are present in that the fees charged are ". . . applicable only to a type of business or occupation which is subject to supervision and regulation by the licensing authority under its police power . . .", and ". . . such supervision and regulation are in fact conducted by the licensing authority . . .".

In its brief the City does not recite the complete and authoritative statement of the Chief Justice in the *National Biscuit Company* case but, as we understand the oral argument of the able assistant city solicitor, it is contended that the stamp fees in question do not meet what are there declared to be the third and fourth characteristics of a true license fee.

It is argued that the Bedding Act does not require that a license be first obtained in order to engage or continue in the business covered by the Act, with revocations thereof for violations, and that in the case of all of the groups of business whose immunity from the Philadelphia Mercantile License Tax was upheld in the *National Biscuit Company* case, a "license" under the respective Acts of Assembly involved was a prerequisite of engaging in business. The third element or characteristic of a true license fee as defined in the *National Biscuit Company* case is ". . . that the payment of the fee is a condition upon which the li-

censee is permitted to transact his business or pursue his occupation . . .". The payments of the fees required by Section 8 of the Bedding Act must be met by the plaintiff manufacturer in order to transact its business. It cannot sell in Pennsylvania a single article of its manufacture without obtaining the stamp which must be affixed thereto. Upon any failure so to do plaintiff's sterilizing and disinfecting permit may be revoked (Section 6(d) of the Act) and fines and other criminal sanctions may be imposed (Section 12(a)). The plaintiff paid $1,000 in 1952 and $1,200 in 1953 for the necessary stamps in order to be permitted to stay in business. Determination of whether charges imposed by the Legislature are true license fees requires a realistic approach and the nomenclature used is of little importance. The nature and apparent purpose of the charge is controlling, and it is none the less a true license fee when imposed as a condition for continuing in a business rather than upon entering it.

The City also claims that the fourth test of a true license tax laid down in the *National Biscuit Company* case is not met. This test is ". . . that the legislative purpose in exacting the charge is to reimburse the licensing authority for the expense of the supervision and regulation conducted by it. . .". In amplification it was stated: ". . . Therefore, even though the charge be labeled a 'license fee,' it cannot be regarded as such if, being merely nominal in amount and not apparently equated to the probable cost of supervision and regulation of the licensee's activities, it presumably was not legislatively intended to provide for such cost; in such a case it must be considered as merely a registration charge intended to cover clerical costs of the issuance of the license certificate and general office expenses, and in that event it does not, of course, prevent municipal taxation under the grant of power made in the

Sterling Act.". It is argued that the charge of $15 for a thousand stamps means but a paltry fee per mattress or other article manufactured and sold. But it is not the fee paid upon a single transaction or paid by any one person subject to the license fee that is determinative. It is the aggregate of fees payable by all upon whom the fee is imposed that determines whether the charge is to reimburse the State for the cost of supervision and regulation. Thus in *Pittsburgh Milk Company v. Pittsburgh et al.*, 360 Pa. 360, 62 A. 2d 49, where it was held that the Act of June 25, 1947, P. L. 1145, prevented the imposition of the Pittsburgh Mercantile Tax, the fees imposed under the State Milk Control Law of 1937 ran through a graded schedule from as low a charge as $1 to a charge of $5,000, depending upon the amount of milk handled. The stamp fees charged under the Bedding Act are likewise proportionately imposed, the manufacturers with the greater volume of production paying a larger share of the cost of regulation than do those of smaller volume of production, for the more mattresses produced, the more stamps must be purchased. And the total paid by all subjected to the payment not only equates but exceeds the cost of regulation. It would of course be impossible for the Legislature to fix the fees payable in such amount as to place receipts and expenditures in exact balance.

There remains for consideration the contention that the impact of the stamp fees is not the same as the impact of the City Mercantile License Tax and therefore no duplication of tax exists; that the City's tax is on the privilege of doing business generally while the State's levy is either on the transaction of sale or the privilege to deal with the particular articles covered by the Bedding Act. We consider the contention untenable. It is first argued that plaintiff's stamp fees are paid on the transactions of sale because of the provi-

sion in the Act that no article covered by it may be sold or leased unless a stamp is attached thereto, and on this premise the alternative assertion is made that the State tax is on the privilege of selling the particular articles, whereas the City tax is on the over-all business of selling, and thus no duplication of impact occurs. This ingenious conception ignores the character and purpose of the State legislation. The history of the Bedding Act and its provisions, considered as a whole, make clear that it is not a measure to raise revenue by placing a tax upon the selling of the articles covered by the Act, but an exercise of the police power of the Commonwealth for the protection of users of mattresses and kindred articles which have been exposed to infection or are otherwise unsanitary. To accomplish this end, the source of supply commands chief attention, and accordingly the Act requires sterilizing and disinfecting processes of all producers. In necessary supplementation to effectively accomplish the policing of the industry, sales are prohibited of any article that does not contain the tag showing compliance with the Act, and this requires inspections of the articles covered by it in the possession of the retailer as well as the primary inspection of the plant and business of the manufacturer. The retailer may acquire for sale articles covered by the Act manufactured in another State, and in such case would have to obtain the required tag and the stamp required to be affixed thereto, but is not required to do so in the case of articles purchased from a Pennsylvania manufacturer, for they are already tagged and stamped. It is obvious that few if any retailers pay the stamp fees in the magnitude of amount expended therefor by the manufacturer. In 1953 the plaintiff purchased stamps in the amount of $1,200. At $15 per thousand this meant stamps for 80,000 mattresses or box springs.

Appellant in support of its argument that the stamp fees are paid on the transaction of sale, emphasizes the role of the retailer. We think appellant fails to see the forest for the trees. Unquestionably in accomplishing its purpose the requirements of the Act are aimed at the source of supply, and other requirements but a necessary incidence of enforcement. In any event we are not here concerned with a retailer. The taxpayer before the Court is a manufacturer who is required to obtain and affix a stamp to every article it produces for sale.

In support of this last contention a number of cases are cited by counsel. We deem them clearly inapposite. In *Philadelphia v. Samuels*, 338 Pa. 321, 12 A. 2d 79, the Court was concerned with the tax imposed by the City upon ". . . gross receipts from all transactions in or for the parking of automobiles or motor vehicles on open parking lots . . .". It was held that the tax was an excise tax upon transactions and therefore did not conflict under the "Sterling Act" with the State Capital Stock and Corporate Net Income Taxes which were property taxes. The case had nothing to do with a State regulatory statute or license fees imposed to reimburse the regulatory agency. There is the same lack of analogy in *Sablosky v. Messner*, 372 Pa. 47, 92 A. 2d 411, and *Rice Drug Company v. Pittsburgh et al.*, 360 Pa. 240, 61 A. 2d 878. In the former the only question before the Court was the constitutionality of The Realty Transfer Tax Act (Act of December 27, 1951, P.L. 1742) which for revenue purposes required stamps on documents, and in the latter the Cigarette Tax Act (Act of May 13, 1947, P.L. 215) imposing a sales tax for revenue was under consideration. The payment required of plaintiff under the Bedding Act ". . . is a charge which is imposed by the sovereign, in the exercise of its police power, upon a person within its juris-

diction for the privilege of performing certain acts and which has for its purpose the defraying of the expense of the regulation of such acts for the benefit of the general public; it is not the equivalent of or in lieu of an excise or a property tax, which is levied by virtue of the government's taxing power solely for the purpose of raising revenue: . . .": *Pennsylvania Liquor Control Board v. Publicker Commercial Alcohol Company,* 347 Pa. 555, 561, 32 A. 2d 914, (quoted with approval in the *National Biscuit Company* case).

The City's Mercantile License Tax, as appellant states, is imposed upon plaintiff's privilege to engage generally in the business of manufacturing and selling mattresses and upholstered box springs—the only business in which it is engaged. It is clear that plaintiff cannot continue in its business unless it meets the requirements of the Bedding Act and pays the fees therein exacted for its policing. Therefore the impact of the City tax falls upon the same incident, namely, the privilege of continuing to engage in the business of manufacturing and selling the articles which it produces. In our opinion the City tax invades the field reserved to the State under the "Sterling Act".

Judgment affirmed.

Mr. Justice JONES dissents.