## Wanamaker v. Philadelphia School District et al., Appellants.

Argued September 30, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused March 17, 1971.

*Frederic L. Ballard,* with him *Tyson W. Coughlin,* and *Ballard, Spahr, Andrews & Ingersoll,* for appellants.

*Park B. Dilks, Jr.,* with him *Natalie I. Salkind,* and *Morgan, Lewis & Bockius,* for appellees.

*Samuel D. Slade, Fred L. Rosenbloom* and *Schnader, Harrison, Segal & Lewis,* for amicus curiae.

OPINION BY MR. JUSTICE EAGEN, January 7, 1971:

The sole question presented by this appeal is whether the Business Use and Occupancy Tax of Philadelphia, imposed on the use or occupancy of real estate for commercial or industrial activity, is an unequal tax on real estate and thus violates the Uniformity Clause of the Pennsylvania Constitution.[1] We hold today that the tax in question is a valid privilege tax on the use of such real estate and, hence, is in no sense violative of the uniformity provision.

The facts and history of the case may be summarized as follows:

On June 4, 1970, the Council of the City of Philadelphia enacted Bill No. 1860 authorizing the Board of Education of the School District of Philadelphia to impose a tax ". . . on the use or occupancy of real estate . . ." within the School District for the purpose of carrying on any commercial or industrial activity.[2] The ordinance was to become effective on July 1, 1970.

---

[1] The Uniformity Clause provides: "All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." Pa. Const. art. VIII, §1 (1968).

[2] Bill No. 1860, amending Section 19-1800 of The Philadelphia Code, reads, in part, as follows:

"(2) Imposition of the Tax. The Board of Education of the School District of Philadelphia is authorized to impose a tax for general public school purposes on the use or occupancy of real

On June 8, 1970, the Board of Education passed a resolution imposing the tax authorized by Bill No. 1860.

estate within the School District of Philadelphia during the tax year beginning July 1, 1970, for the purpose of carrying on any business, trade, occupation, profession, vocation, or any other commercial or industrial activity. This tax is imposed on the user or occupier of real estate.

"(3) Exlusions.

"(a) This authorization shall not include the authority to levy a tax on the use or occupancy of real estate to the extent that the real estate is used or occupied as the dwelling or principal place of residence of the user or occupier or its use or occupancy is subject to tax by the Commonwealth of Pennsylvania under the Tax Act of 1963 for Education.

"(b) This authorization shall not authorize this tax to be imposed upon any person exempt from real estate taxes in the City of Philadelphia.

"(4) Rate of Tax. The tax authorized by this section shall be measured by the assessed value of the real estate at a rate not to exceed $1.25 per $100 of the assessed value of real estate as most recently returned by the Board of Revision of Taxes. The tax to be paid by the user or occupier shall be computed as follows:

$$\frac{\text{Square feet occupied or used}}{\text{Total square feet available for use or occupancy on the real estate}} \times \text{Assessed value} \times \text{Rate of Taxation} \times \frac{\text{Days of actual use or occupancy}}{360}$$

"(5) Collection of the Tax.

"(a) Each owner of real estate used or occupied solely by himself, which use or occupancy is subject to tax under this section, shall make a return to the Commissioner and pay any tax due within 25 days after the end of any month for which any tax is due.

"(b) Each landlord or other person authorized to collect rentals on premises, the use or occupancy of which is subject to tax under this section, shall collect monthly as agent for the School District of Philadelphia, from each user or occupier the proper proportion of the user's or occupier's tax and make a return to the Commissioner and pay the total tax collected, together with any

On June 17, 1970, the appellees, various owners-occupiers of real estate in Philadelphia used for business purposes, instituted this suit challenging the tax and requesting this Court to take original jurisdiction. The School District filed preliminary objections, and appellees filed an amended complaint. This Court refused to take original jurisdiction on June 30, 1970.

The case was then argued before the Honorable Edmund B. SPAETH, JR., on July 21, 1970, after the parties had filed stipulations of facts in lieu of testimony. On August 24, 1970, Judge SPAETH filed an opinion holding the tax unconstitutional. The parties then stipulated that Judge SPAETH's decree nisi be considered as a final decree. A timely appeal was filed with the Court, and our jurisdiction was properly invoked under the Act of June 24, 1895, P. L. 212, as amended, Act of August 14, 1963, P. L. 819, §2, 17 P.S. §191.4.[3] The Philadelphia Industrial Development Corporation and the Philadelphia Port Corporation filed a brief as amicus curiae on behalf of the appellees, indicating the detrimental economic effects the proposed tax would have, in their view, on Philadelphia's ability to attract new industry.

We start with the proposition that the challengers of the constitutionality of state or local taxation bear a very heavy burden in their efforts to overturn such legislation. *Campbell v. Coatesville Area School District*, 440 Pa. 496, 270 A. 2d 385 (1970) ("clear, palpa-

---

tax for which the landlord or other person is liable, to the Commissioner within 25 days after the end of any month for which any tax is due."

[3] This statute was repealed by the "Appellate Court Jurisdiction Act of 1970", Act of July 31, 1970, P. L.    , 17 P.S. §211.101 *et seq.* (Purdon's Pennsylvania Legislative Service p. 476) (effective September 11, 1970). Under the 1970 Act, jurisdiction of the present appeal would be in the Commonwealth Court. However, since the appeal was filed prior to September 11, 1970, the Act of 1895 governs and the appeal is properly here.

ble and plain violation" standard applied to local municipal taxation); *L. J. W. Realty Corp. v. Philadelphia*, 390 Pa. 197, 134 A. 2d 878 (1957) ("clearly, palpably, plainly" leaving "no doubt or hesitation in our minds"). The court below held that the appellees carried that burden inasmuch as the method of computation caused the tax to be levied on real property. We conclude the lower court erred for the reasons that follow.

The use and ownership of property are distinct and separate. The right to use property is just one of the several rights incident to ownership, *Henneford v. Silas Mason Co.*, 300 U.S. 577, 57 S. Ct. 524 (1937); *Billings v. United States*, 232 U.S. 261, 34 S. Ct. 421 (1913); *Ampco Printing v. City of New York*, 14 N.Y. 2d 11, 197 N.E. 2d 285 (1964). As stated by Mr. Justice Cardozo in *Henneford*, supra, "The privilege of use is only one attribute, among many, of the bundle of privileges that make up property or ownership". 300 U.S. 582, 57 S. Ct. 526-27. And in several cases the United States Supreme Court has upheld taxes on the use of personal property as a form of excise tax. *See Henneford v. Silas Mason Co.*, 300 U.S. 577, 57 S. Ct. 524 (1937); *Burnet v. Wells*, 289 U.S. 670, 53 S. Ct. 761 (1933); *Nashville C. & St. L. Ry. v. Wallace*, 288 U.S. 249, 53 S. Ct. 345 (1933); *Billings v. United States*, 232 U.S. 261, 34 S. Ct. 421 (1913); and *Hylton v. United States*, 3 Dall. 171, 1 L. ed. 556 (1796). While the foregoing cases involved personal rather than real property, as in the case here, this, to us, is of no legal significance. Is there any difference or legal significance between that bundle of *rights* which we call *ownership* of real property and that termed *ownership* of personal property? Can it be fairly said that *active use* is consciously calculated into the ad valorem property tax when, for example, the measure of the property tax of a building suitable to use as a department store,

but which is empty and not so used, is the same as that of the thriving Wanamaker's, namely, the fair market value?

The lower court attempted to distinguish certain of the use tax cases cited hereinbefore, especially *Henneford v. Silas Mason Co.,* by noting that an *equalizing,* non-recurring tax was there being imposed on personal property, *i.e.,* that the use tax was imposed not for the privilege of doing business but to compensate the sales tax by permitting taxation of property brought into and used within the limits of the taxing authority under circumstances that prevented collection of the sales tax.

But, we believe the case of *Billings v. United States,* 232 U.S. 261, 34 S. Ct. 421 (1913), cannot be distinguished in this fashion. *Billings* involved the construction and constitutionally of §37 of the Tariff Act of 1909, imposing an annual tax *on the use* of foreign-built yachts.

The plaintiff argued, *inter alia,* that the tax was repugnant to the due process clause of the Fifth Amendment because there were many domestic yachts whose use was identical to his which escaped taxation. Important for our purposes is what Chief Justice WHITE had to say in upholding the tax about "use" as the basis for taxation: "[I]t is not ownership but the election during the taxing period of the owner to take advantage of one of the elements which are involved in ownership, the right to use which is the subject upon which the statute places the excise duty. In this view the fact of use, not its extent or its frequency, becomes the test, as distinguished from mere ownership, for that in the statutory sense could exist without use having taken place. . . . Let it be conceded that the ownership of property includes the right to use, plainly we think, as use and ownership are distinguished one from the other in the provision, the word 'use' as there em-

ployed means more than the mere privilege of using which the owner enjoys, and relates to its primary signification, as defined by Webster; 'The act of employing anything or of applying it to one's service; the state of being so employed or applied'. If the use which arises from the fact of ownership without more was what the statute proposed, then it is inconceivable why the difference between use and ownership was marked in the provision and made the basis of the tax which it imposed. While this construction in this case leads to the same conclusion as does that which the court below affixed to the statute, that is, that it taxed the privilege of use, or, in other words the potentiality of using involved in ownership, inherently there is this fundamental difference between the interpretation we give and that which the lower court adopted, since the privilege of use is purely passive (or subjective), a right which necessarily pertains to ownership and must exist where there is ownership, as one may not obtain ownership without acquiring the privileges of use which ownership gives. The other, on the contrary, that is, use in the statutory sense, although it arises from ownership, is active (objective), that is, it is the outward and distinct exercise of a right which ownership confers but which would not necessarily be exerted by the mere fact of ownership." 232 U.S. at 280-81.

The Court's analysis of the concept of use in the *Billings* case, *supra,* points the way to an understanding of the tax under consideration here. In *Billings,* what was levied upon was the *"outward and distinct exercise of a right which ownership confers but which would not necessarily be exerted by the mere fact of ownership".* (Emphasis supplied.) 232 U.S. at 281. This active, ongoing exercise of the use of property for commercial purposes is the precise incident which the School Board's tax falls upon, and with constitutional sanction.

It can be conceded without fatality to the appellants' case that the ad valorem property tax is bottomed on factors which include the intrinsic element of use. " 'We have defined market value as the price which a purchaser willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied'." *Flamingo Apartments, Inc. v. Board of Revision of Taxes,* 383 Pa. 223, 225, 118 A. 2d 197, 198 (1955). But, it is submitted, this latter element of use is what the *Billings* court termed "purely passive". There still remained that active exercise of the right, "that state of being so employed or applied", which was held taxable to Mr. Billings. In this case, the Philadelphia School Board has gone and done likewise. While economically the incidence of the tax is on the property itself, its legal incidence is on the privilege of using, making it a true excise tax.

It has been said in the past that real estate only has taxable value because of its actual or potential use. *Flamingo Apartments, Inc. v. Board of Revision of Taxes,* 383 Pa. 223, 118 A. 2d 197 (1955) ; *Hudson Coal Company's Appeal,* 327 Pa. 247, 193 Atl. 8 (1937). While surfacely this statement appears to be unimpeachable, we are persuaded that other cases show that it should not be taken as the all-inclusive and final test. The taxable value of property is not solely derived from its actual use or the uses to which it may be adapted; it is not deemed valueless because it is not able to be put to any use. *Marine Coal Co. v. Pgh. M. & Y. R. R. Co.,* 246 Pa. 478, 92 Atl. 688 (1914). "The particular use [of the land] . . . is a mere collateral consideration. In estimating the market value of the land everything which gives it intrinsic value is a proper element for consideration." *Shenango and Allegheny Railroad Co. v. Braham,* 79 Pa. 447, 453 (1875).

Having persuasively demonstrated, we hope, that the imposition of a tax on the use of real estate is constitutionally permissible, we now address ourselves to the reasons why the lower court ruled that the levy involved was a direct realty tax, rather than an excise tax.

The basic reasons furnished by the lower court in striking down this tax were: (1) that when such a recurring tax as this is imposed on the use by an owner of his own real estate, it is in no wise different from a real property tax;[4] (2) because the standard of measurement is not directly related to the exercise of any alleged privilege since the sole method of computing the tax is the assessed value of the land.

As to No. 1, we see no reason in law or logic why, as outlined earlier, if the incident of use can be separated from ownership of personal property and individually taxed, it cannot be so done with real property. To repeat the words, quoted before, of Chief Justice WHITE in *Billings v. United States*, 232 U.S. 261, 34 S. Ct. 421 (1913), "[I]t is not ownership but the election during the taxing period of the owner to take advantage of one of the elements which are involved in ownership, the right to use which is the subject upon which the statute places the excise duty. In this view the fact of use, not its extent or its frequency, becomes the test, as distinguished from mere ownership, for that in the statutory sense could exist without use having taken place." 232 U.S. at 280.

The second and principal reason advanced by the lower court, that "the sole method of computing the tax is the assessed value of the land," *fails to take into*

---

[4] In his able opinion below Judge SPAETH observed, ". . . to speak of an owner's 'privilege' of occupying his real estate is itself a confusion. If someone owns real estate he has a right to occupy it. To denominate his right a privilege is to transform it by diminishing it."

*consideration the taxing formula which adjusts the amount of the tax to the space occupied times the number of days of the activity,* a rather seismographic test which records all tremors of use and is levied on just those recordings and nothing else.

We would agree that if a tax is assessed solely in the same manner as a real estate tax, *i.e.,* on the total value of the property used, this is a factor to be considered in determining the true nature of the tax, but we cannot agree that this, in itself, renders the tax per se an in rem tax. *See United States v. City of Detroit,* 355 U.S. 466, 78 S. Ct. 474 (1958). There Mr. Justice BLACK stated for the majority: "Nevertheless, the Government argues that since the tax is measured by the value of the property used it should be treated as nothing but a contrivance to lay a tax on that property. We do not find this argument persuasive. A tax for the beneficial use of property, as distinguished from a tax on the property itself, has long been a commonplace in this country. See Henneford v. Silas Mason Co., 300 U. S. 577, 582-583. In measuring such a use tax it seems neither irregular or extravagant to resort to the value of the property used; indeed no more so than measuring a sales tax by the value of the property sold." 355 U.S. at 470, 78 S. Ct. at 476.

We adopt *City of Detroit,* supra, to the extent that it supports the proposition that the measure of the tax is only one factor, albeit a considerable one, among several by which a determination of the true nature of the tax is to be made by the courts.

The general indicia of a property tax are said to be that it is a levy "on all property or on all property of a certain class . . . on a specified date in proportion to its value (as assessed by the assessors) . . . the obligation to pay *which is absolute and unavoidable and is not based on any voluntary action of the person as-*

*sessed"*. (Emphasis supplied.) *Cf.* 51 Am. Jur., *Taxation*, §29. However, the tax obligation involved here is in no way absolute (it can be escaped by not using the property in one of the enumerated ways); it results from the voluntary election by the owner to use the property in a certain way; and it is measured by the extent to which this election is enjoyed.

The court below, in considering Section 3(b) of the ordinance,[5] also determined that there would be a conflict within the measure "were the taxing section to refer to privilege and the exemption section to property." We believe the statute has internal consistency in that Section 3(b) excludes from taxation *persons*— not property—while the taxing section taxes *persons, i.e.,* business users of property, and not the property which they use or occupy.

Finally, the Philadelphia Industrial Development Corporation and the Philadelphia Port Corporation, as amicus curiae, have characterized the tax as one which would drive many businesses from the city. But this argument is addressed to the wisdom of the legislature and hence is beyond the scope of our consideration. "It has become a mere platitude to state, what has so often been proclaimed, that Courts are concerned, not with the wisdom of legislation, but with the right of the legislative body to enact it—not with policy but with power." *National Biscuit Co. v. Philadelphia,* 374 Pa. 604, 608, 98 A. 2d 182, 184 (1953).

Decree reversed and the complaint is dismissed. Each party to pay own costs.

Mr. Justice COHEN took no part in the decision of this case.

---

[5] Section 3(b) provides: "This authorization shall not authorize this tax to be imposed upon any person exempt from real estate taxes in the City of Philadelphia."

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

The province and power of a Court is to determine the validity and Constitutionality of a statute and/or an ordinance. In the light of present-day conditions, I believe this commercial use tax is unfair and unwise, but that is not determinative of its validity or its Constitutionality.

The issues here involved, namely, (1) whether the tax is a property tax or an excise tax, and (2) whether the tax is Constitutional, present close and difficult questions. A property tax, we all agree, must comply with our Constitutional requirement of *uniformity*, Pennsylvania Constitution, Article VIII, Section 1. Although the distinction between a property tax and a use or privilege or excise tax is often, and is here, because of the poorly worded ordinance, shadowy, I believe that this tax is a privilege or use or excise tax, and not a tax on real estate as such, and is valid and Constitutional.

However, I take this opportunity to state that our Court has made a mistake in the test which we have created for the determination of the Constitutionality or Unconstitutionality of a statute or ordinance. We have too frequently unwisely expressed the test in the language which is quoted in the majority Opinion: "No act or portion thereof should be declared unconstitutional unless 'it violates the Constitution clearly, palpably, plainly, *and in such manner as to leave no doubt or hesitation in our minds.*'"* *Realty Corp. v. Philadelphia*, 390 Pa. 197, 205, 134 A. 2d 878; *Sablosky v. Messner*, 372 Pa. 47, 59, 92 A. 2d 411; *Kelley v. Baldwin*, 319 Pa. 53, 54, 179 Atl. 736.

In these troubled times, when doubt, hesitation and confusion are so prevalent throughout Pennsylvania, and indeed throughout our entire Country, as to be a

---

* Italics, ours.

part and parcel of nearly everything we do, think about, or see, or hear or read in our everyday life, *the inclusion in the test for Constitutionality "as to leave no doubt or hesitation in our minds"* has become a very foolish, very unrealistic, and very unnecessary part of the test for determining the Constitutionality or the Unconstitutionality of an Act and/or an ordinance.

For these reasons, I would change and completely eliminate from the test of Constitutionality, the words "and in such manner as to leave no doubt or hesitation in our minds".

―――――

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

In a single stroke, the majority has largely obliterated the Uniformity Clause from the Pennsylvania Constitution insofar as that clause has been applied to the taxation of real property in an uninterrupted line of cases since 1909. See *Madway v. Board for the Assessment and Revision of Taxes,* 427 Pa. 138, 233 A. 2d 273 (1967); *Deitch Co. v. Board of Property Assessment,* 417 Pa. 213, 209 A. 2d 397 (1965); *McKnight Shopping Center, Inc. v. Board of Property Assessment,* 417 Pa. 234, 209 A. 2d 389 (1965); *Buhl Foundation v. Board of Property Assessment,* 407 Pa. 567, 180 A. 2d 900 (1962); *Delaware, Lackawanna & Western Railroad Co.'s Tax Assessment (No. 1),* 224 Pa. 240, 73 Atl. 429 (1909).

For half a century it has been the clear, firm, and unquestioned view of this Court ". . . that the uniformity clause forbids the taxing of one man's land at a lower rate than another's simply because of the type of building erected, *or the type of business conducted thereon*". *Madway v. Board for the Assessment and Revision of Taxes,* supra, at 146-47, 233 A. 2d at 278. (Emphasis added.) "The central thought running through all the opinions is that the principle of uniformity is a constitutional mandate to the courts, to

the legislature, and to the taxing authorities, in the levy and assessment of taxes which cannot be disregarded. The purpose of requiring all tax laws to be uniform is to produce equality of taxation. . . . Each taxpayer, no matter how great or small, has a right to demand that his property shall be assessed upon the basis of a uniform valuation of other properties belonging to the same class and within the territorial limits of the authority levying the tax . . . . It will not do to assess farm lands at one-fifth their actual value, dwelling houses at one-third, manufacturing establishments at one-half, and coal lands at full value. The Constitution says the valuation must be uniform on the same class of taxable subjects and *real estate is a taxable subject of a particular class* . . . hence the rule of uniformity must be applied to all kinds of real estate as a class." *Delaware, Lackawanna & Western Railroad Co.'s Tax Assessment (No. 1),* supra, at 243-48, 73 Atl. at 430-32.[1] (Emphasis added.)

Yet today the majority gives constitutional sanction to a semantic sleight of hand that will permit any local taxing authority to subdivide real estate taxes into separate classifications merely by terming its action a tax on the "use" of the property. Thus, multiple family dwellings can be taxed at a different rate from single family dwellings; tenant-occupied houses can be taxed differently from owner-occupied houses; a man who conducts his profession or business from his home will be subject to a different property tax than his next door neighbor, because his "use" of his property is different from that of his neighbor.

The majority concedes that ". . . economically the incidence of the tax [here in question] is on the prop-

---

[1] For background information on uniformity clauses around the country, see Hellerstein, State and Local Taxation 32-44 (1961) ; Newhouse, Constitutional Uniformity and Equality in State Taxation 9-48 (1959).

erty itself . . .", but it insists that "its legal incidence is on the privilege of using . . . ." However, to attach such constitutional significance to the mere interjection of the term "use" into a taxing ordinance, a term that has traditionally concerned only the tax classification of *tangible personal property,* is to permit the wholesale avoidance of the long established mandate of the uniformity clause as that clause has been interpreted in the line of cases from *Delaware* (1909) to *Madway* (1967).

In sum, the majority exalts mere form over clear substance contrary to the dictates of sound and controlling principles of statutory interpretation. As Mr. Justice BRANDEIS aptly stated: "The name by which the tax is described in the statute is, of course, immaterial. Its character must be determined by its incidents. . . . To levy a tax by reason of ownership of property is to tax the property . . . It cannot be made an occupation or license tax by calling it so. . . ." *Dawson v. Kentucky Distilleries & Warehouse Co.,* 255 U.S. 288, 292-94, 41 S. Ct. 272, 274-75 (1921) (citations omitted) (holding state tax to be a property tax and hence violative of the state constitution's uniformity clause).[2] The majority would likewise do well to heed the long prevailing maxim, reiterated by Mr. Justice SUTHERLAND, that ". . . 'what cannot be done directly because of constitutional restriction cannot be accomplished indirectly by legislation which accomplishes the same result' . . .". *Macallen v. Massachusetts,* 279 U.S. 620, 629, 49 S. Ct. 432, 435 (1929) (citations omitted) (holding state tax on federal securities invalid).

Indeed, this Court itself in the past and until today has consistently looked to the substance of a taxing measure rather than to the designation given it by the legislature. See, e.g., *Gaugler v. Allentown,* 410 Pa.

---

[2] See discussion infra, pp. 7-9.

315, 317, 189 A. 2d 264, 265 (1963); *National Biscuit Co. v. Philadelphia,* 374 Pa. 604, 615, 98 A. 2d 182, 187 (1953); *Flynn v. Horst,* 356 Pa. 20, 27, 51 A. 2d 54, 58 (1947). The majority fails to suggest any reason for forsaking that approach in this case, nor can any be discerned.

In concluding that a tax upon the use and occupancy of central city real estate for commercial purposes is not a tax upon the real estate itself, but only upon one attribute of its ownership, the majority relies almost entirely upon the United States Supreme Court decision in *Billings v. United States,* 232 U.S. 261, 34 S. Ct. 421 (1913). That decision, however, is wholly inapposite.

The issue in *Billings* concerned the constitutionality of Section 37 of the Payne-Aldrich Tariff Act of August 5, 1909, imposing a tonnage duty on foreign built yachts, pleasure boats, or vessels ". . . not used or intended to be used for trade, now or hereafter owned or chartered for more than six months by any citizen or citizens of the United States, a sum equivalent to a tonnage tax of seven dollars per gross ton." 232 U.S. at 277, 34 S. Ct. at 422.[3] The tax was held to be an excise tax on the use of foreign built yachts, and the Court did enter into a discussion of the difference between "ownership" and "use", as quoted by the majority. However, that language has absolutely no relevance to the problem now before us for several reasons.

The core of the *Billings* opinion was the reasonableness of the classification of yachts as "domestic" and "foreign built" for purposes of the equal protection clause. Had the tax been on the use of yachts built in a particular state to the exclusion of yachts built in another state, there is no question but that the tax would

---

[3] Section 37 was repealed by the Underwood Tariff Act of October 3, 1913, c. 16, §14, S, 38 Stat. 201.

be invalid as a violation of federal uniformity. Id. at 282, 34 S. Ct. at 424. "[T]he difference between things domestic and things foreign and their use are apparent on the face of things and are expressly manifested by the text of the Constitution." Id. at 283, 34 S. Ct. at 425. Thus, the *sine qua non* of the validity of the tax was that the yachts be foreign built. Nothing resembling that issue is now before this Court.

The United States Supreme Court in *Billings* did discuss the nature of the yacht tax as it related to the use of the property, for the Court had to determine whether the tax was a direct tax. However, the discussion pertained to the use of *tangible personal property*—the traditional subject of a "use" tax. E.g., The Tax Act of 1963 for Education, Act of March 6, 1956, P. L. (1955) 1228, Art. 1, §1, as amended, Act of May 29, 1963, P. L. 49, §2, 72 P.S. §3403-1 et seq. See *Commonwealth v. Central Pennsylvania Quarry Stripping & Const. Co.*, 422 Pa. 573, 222 A. 2d 728 (1966); see generally Hartman, State Taxation of Interstate Commerce, 131-47, 161-79 (1953); "What is a Property Tax", Annot., 103 A.L.R. 18, 95 (1936). The distinctions between tax classifications of real property and tax classifications of personal property heretofore consistently have been recognized by this Court as necessitating different treatment with respect to the Uniformity Clause. Compare *Deitch Co. v. Board of Property Assessment*, 417 Pa. 213, 209 A. 2d 397 (1965) and *McKnight Shopping Center, Inc. v. Board of Property Assessment*, 417 Pa. 234, 209 A. 2d 389 (1965) *with Jones & Laughlin Tax Assess. Case*, 405 Pa. 421, 175 A. 2d 856 (1961). No justification exists for removing that distinction.

The Court, in *Billings*, was aware of the unique nature of the tax before it. "But it is to be observed that it may well have been that the character of the property with which the statute deals and the mere ele-

ment of caprice as to its use and the uncertainties of the subject led to the fact of making the use alone the criterion as the wiser and juster method of operating equally upon all." 232 U.S. at 281-82, 34 S. Ct. at 424.

Furthermore, the United States Supreme Court in *Billings* was interpreting and determining the constitutionality of an Act of Congress. *No federal issue* is involved in the case the majority decides today. We are not bound by the language of the United States Supreme Court when we are interpreting the constitutionality of a local taxing ordinance under the Pennsylvania Constitution. "The question of validity of a state or municipal tax is one which the state courts are peculiarly fitted to answer and which, therefore, a federal court should not consider." *United States v. City of New York,* 175 F. 2d 75, 77 (2d Cir.), cert. den., 338 U.S. 885, 70 S. Ct. 189 (1949).

Nor does *Billings* even offer a valuable analogy. The constitutional challenge in *Billings* centered on the equal protection clause of the Fourteenth Amendment of the federal constitution, and the demands of equal protection as applied to taxing measures are far more lenient than those of our own Uniformity Clause. In *Davidson v. New Orleans,* 96 U.S. (6 Otto) 97 (1878). the United States Supreme Court, in referring to a tax law, declared: "[i]t may violate some provision of the State Constitution against unequal taxation; but the Federal Constitution imposes no restraints on the States in that regard," and ". . . we know of no provision in the Federal Constitution which forbids . . . unequal taxation by the States." Id. at 105, 106.

A short time later the Court recognized that the federal constitutional doctrine of equal protection did have some relevance in the area of taxation but continued to suggest that great deference would be ac-

corded to the legislative judgment as to the unequal allocation of tax burdens.

"We think that we are safe in saying that the fourteenth amendment was not intended to compel the states to adopt an iron rule of equal taxation. If that were its proper construction, it would . . . [inter alia] supersede all those constitutional provisions and laws of some of the states, whose object is to secure equality of taxation. . . ." *Bell's Gap R. Co. v. Pennsylvania,* 134 U.S. 232, 237, 10 S. Ct. 533, 535 (1890) ; see Tussman & tenBroek, The Equal Protection of the Laws, 37 Cal. L. Rev. 341, 369-70 (1949). But this Commonwealth *has* chosen to adopt such a constitutional rule of equal taxation, to wit: the uniformity clause. That the federal standard of equal protection and our constitutional rule of uniformity are quite different can be further demonstrated by comparing *Shaffer v. Carter,* 252 U.S. 37, 40 S. Ct. 221 (1920), sustaining the constitutionality of a state graduated income tax, with *Kelley v. Kalodner,* 320 Pa. 180, 181 Atl. 598 (1935), where this Court found a similar graduated income tax to be violative of our Uniformity Clause. See generally, Newhouse, Constitutional Uniformity and Equality in State Taxation, 601-09 (1959).

In light of the foregoing, I fail to understand how the majority can deem the *Billings* case to be relevant authority for its present conclusion, much less deem it controlling.

Even assuming *arguendo* that a personal property tax case can be relevant to the real property taxation issue presently before us, the more apposite case would be *Dawson v. Kentucky Distilleries & Warehouse Co.,* supra, which was decided *after* the *Billings* case and which involved not a federal issue of equal protection but rather an issue of the application of the uniformity clause of the Kentucky state constitution.

The majority quotes language from *Billings* that " '. . . the election during the taxing period of the owner to take advantage of one of the elements which are involved in ownership—the right to use . . .' " as being descriptive of what is being taxed by the Business Use and Occupancy tax. The majority continues by asserting that Wanamaker's has the *choice* whether or not to use its property for business. No such choice exists.

In *Dawson,* the United States Supreme Court held a Kentucky "annual license tax" of 50 cents a gallon upon all whiskey either withdrawn from bond or transferred in bond from Kentucky to a point outside that state to be a property tax, and therefore concededly invalid under the Kentucky uniformity clause. 255 U.S. at 291, 41 S. Ct. at 274.[4] The Court stated: " 'The whole value of the whiskey depends upon the owner's right to get it from the place where the law has compelled him to put it, and to tax the right is to tax the value.' To levy a tax by reason of ownership of property is to tax the property." Id. at 294, 41 S. Ct. at 275. Compare *Thompson, Auditor v. Kreutzer,* 112 Miss. 165, 72 South. 891; *Thompson, Auditor v. McLeod,* 112 Miss. 383, 73 South. 193, L.R.A. 1918C, 893, Ann. Cas. 1918A, 674. The *Thompson v. McLeod* case relied upon by Mr. Justice BRANDEIS held that the right to extract turpentine from standing trees was the only use to which the property could be put, and that a tax on that right was a property tax.

The principle to be derived from these cases is clear: *a tax levied on the only use to which property*

---

[4] Mr. Justice BRANDEIS noted that the United States Supreme Court was able to pass on whether the tax in question was a property tax, and thus violated Kentucky's uniformity clause— *a question of local law*—because there had been no decision by the highest court of the state interpreting the law. *Dawson v. Kentucky Distilleries & Warehouse Co.,* 255 U.S. 288, 292, 41 S. Ct. 272, 274 (1921).

*can be put is a tax levied by reason of ownership, and therefore a tax on the property.*[5]

As noted above, the majority asserts that Wanamaker's has a choice. However, it is one thing to talk about the freedom of choice of a potential luxury yacht owner to buy his tangible personal property overseas, and quite another to speak of a major department store's freedom to elect to use its real property, located in Philadelphia's central business district, for commercial purposes. Wanamaker's commercial use of its property is the only realistic economic use to which that property can be put. The surrounding land is used for department stores or office buildings. Should Wanamaker's convert to a warehouse, or a manufacturing concern, or an office building, it would still be subject to the tax. The only way Wanamaker's can *choose* to avoid the tax is to not open for business, take down its building, or sell its land. Beyond question, a tax on Wanamaker's commercial use of its land is a tax on ownership, and hence a property tax, as defined by the United States Supreme Court in the *Dawson* case.

The only case cited by the majority which arguably concerns a use tax as applied to *real property* is *United States v. City of Detroit,* 355 U.S. 466, 78 S. Ct. 474 (1958). Appellants relied on the case—particularly the language quoted by the majority—for the proposition that the use of real property can be taxed differently from the property itself. I do not understand that to be the holding of *City of Detroit.*

The issue in that case concerned whether a Michigan statute imposed a tax on the United States in violation of the federal immunity doctrine of *McCulloch v. Maryland,* 17 U.S. (4 Wheat) 316 (1819). The statute

---

[5]See generally, Matthews, The Function of Constitutional Provisions Requiring Uniformity in Taxation, 38 Ky. L.J. 31, 187, 377, 396-405, 503 (1949-50).

in question imposed a tax on *private lessees and users of tax exempt property who used the property in a business* conducted for profit. Any taxes due were the personal obligation of the private lessee or user, and the owner was not liable for their payment. The property involved was an industrial plant *owned* by the United States, and *leased* by Borg-Warner. The United States Supreme Court sustained the validity of the tax.

The case is analagous to our own line of cases which permit *taxation of property* owned by a body ordinarily tax exempt if the property is put to a private, non-public use. *Moon Township Appeal,* 387 Pa. 144, 127 A. 2d 361 (1956), and cases cited therein.

The controlling test is whether the property is used for a public or private use. *West View Borough Municipal Authority Appeal,* 381 Pa. 416, 113 A. 2d 307 (1955). These cases hold that normally tax exempt property is taxable if used for a non-public purpose. The use is not taxable; rather the property is made taxable because of its use.

*City of Detroit* is inapplicable for other reasons. The Michigan statute imposed a tax on private lessees and users of tax exempt property for private profit. The taxes due were the personal obligation of the private lessee or user, and the owner was not liable for their payment. Here, the Business Use and Occupancy Tax applies to owner-occupiers as well as tenants, and owners are secondarily liable. Also, the Michigan tax was compensatory. The tax sought to equalize the tax burden between tenants who leased from private owners and tenants who leased from tax exempt owners. The Business Use and Occupancy Tax, on the other hand, is levied on *only* a particular type of real estate.

The majority places great weight on the "rather seismographic test which records all tremors of use" allegedly incorporated into the tax. Examination of the formula reveals that the School Board can tax at

1.25% of the assessed value, with an adjustment made for the number of days the building is open for business, and the amount of square footage available, but not used, for business.

Clearly the only significant changing factor in the tax is the assessed value of the land. Most on-going businesses are open the same number of days per year and have little space in their buildings not used in some aspect of the business.

Surely the chancellor was correct when he stated in his able opinion that: "Moreover, even the indirect relationship between the exercise of the privilege of business occupancy and the value of the real estate occupied is not given effect in the taxing provision. The standard of measurement is not more related to business use or occupancy than it is to residential or any other use or occupancy. In fact, the tax is measured without regard to whether the particular occupancy is an economic one. What the standard of measuring the tax is directly related to is the ownership interest in property not produced by or dependent upon the exercise of the privilege said to be taxed. Indeed, even to speak of an owner's 'privilege' of occupying his real estate is itself a confusion. If someone owns real estate, he has a right to occupy it. To denominate his right a privilege is to transform it by diminishing it."

Further, as the chancellor noted, Section 3(b) of the ordinance confirms the conclusion that the Business Use and Occupancy Tax is a property tax. Section 3(b) provides: "This authorization [to the Board of Education to impose the tax] shall not authorize this tax to be imposed upon any person exempt from real estate taxes in the City of Philadelphia." If the tax were on a privilege, there would be no necessity to reiterate the validity of property exemptions.

What the majority does today is to judicially revise the Uniformity Clause of the Pennsylvania Con-

stitution to permit the classification of real property. This revision has no basis in reason, logic, or policy, and is clearly contrary to existing Pennsylvania law. Nor is this revision mandated by any decision of the United States Supreme Court. Thus, the majority today grants constitutional sanctity to a real estate taxing device that has no legal or economic justification and violates every heretofore recognized principle of uniformity in real estate and creates for the first time in Pennsylvania a judicially sanctioned discrimination in land taxation.[6] I am as sympathetic as the majority with the substantial financial needs of the Philadelphia School District, but, to paraphrase our thoughts in *Madway*, the City Council should not be permitted to mend Philadelphia's economy by tearing at the fabric of our Constitution.

I would affirm the decree of the Court of Common Pleas of Philadelphia and accordingly, I dissent.

Mr. Justice O'BRIEN joins in this dissent.

---

[6] As Roland Hatfield, the then Commissioner of the Minnesota Department of Taxation stated at a symposium conducted by the Tax Institute of America: ". . . I have observed in respect to the classified property tax system that it cannot work equitably; that it has no effective brake on it; and that it leads to changes in the property tax law which are inspired by politics rather than by economics. In general, I think it is a hazardous experiment to start. If you want the opinion of one who comes from the only state which has a totally classified tax system, let me say that I have recommended and I am still going to recommend that the legislature take steps to reverse this process, if possible. We would like to get back to a property tax system." Hatfield, "Minnesota's Experience with Classification" in The Property Tax: Problems and Potentials 244 (1966).