**[J-31A-2018 and J-31B-2018] [MO: Saylor, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| LORA JEAN WILLIAMS; GREGORY J. SMITH; CVP MANAGEMENT, INC. D/B/A OR T/A CITY VIEW PIZZA; JOHN'S ROAST PORK, INC. F/K/A JOHN'S ROAST PORK; METRO BEVERAGE OF PHILADELPHIA, INC. D/B/A OR T/A METRO BEVERAGE; DAY'S BEVERAGES, INC. D/B/A OR T/A DAY'S BEVERAGES; AMERICAN BEVERAGE ASSOCIATION; PENNSYLVANIA BEVERAGE ASSOCIATION; PHILADELPHIA BEVERAGE ASSOCIATION; AND PENNSYLVANIA FOOD MERCHANTS ASSOCIATION, | : : : : : : : : : : : : : : : | No. 2 EAP 2018<br><br>Appeal from the Order of Commonwealth Court entered on 06/14/2017 at No. 2077 C.D. 2016 affirming the Order entered on 12/19/2016 in the Court of Common Pleas, Philadelphia County, Civil Division, at No. 01452 September Term 2016.<br><br>ARGUED:  May 15, 2018 |
| Appellants | : : : : | |
| v. | : : : : | |
| CITY OF PHILADELPHIA AND FRANK BRESLIN, IN HIS  OFFICIAL CAPACITY AS COMMISSIONER OF THE PHILADELPHIA DEPARTMENT OF REVENUE, | : : : : : : : : | |
| Appellees | : | |
| LORA JEAN WILLIAMS; GREGORY J. SMITH; CVP MANAGEMENT, INC. D/B/A OR T/A CITY VIEW PIZZA; JOHN'S ROAST PORK, INC. F/K/A JOHN'S ROAST PORK; METRO BEVERAGE OF PHILADELPHIA, INC. D/B/A OR T/A METRO BEVERAGE; DAY'S BEVERAGES, INC. D/B/A OR T/A DAY'S BEVERAGES; AMERICAN BEVERAGE ASSOCIATION; PENNSYLVANIA BEVERAGE ASSOCIATION; PHILADELPHIA BEVERAGE | : : : : : : : : : : : : : | No. 3 EAP 2018<br><br>Appeal from the Order of Commonwealth Court entered on 06/14/2017 at No. 2078 C.D. 2016 affirming the Order entered on 12/19/2016 in the Court of Common Pleas, Philadelphia County, Civil Division, at No. 01452 September Term 2016.<br><br>ARGUED:  May 15, 2018 |

ASSOCIATION; AND PENNSYLVANIA
FOOD MERCHANTS ASSOCIATION,

       Appellants

       v.

CITY OF PHILADELPHIA AND FRANK
BRESLIN, IN HIS OFFICIAL CAPACITY
AS COMMISSIONER OF THE
PHILADELPHIA DEPARTMENT OF
REVENUE,

       Appellees

    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :

## DISSENTING OPINION

**JUSTICE WECHT**                                    **DECIDED:  July 18, 2018**

I agree with the doctrinal framework set forth by the learned Majority, which invokes the legislative intent we have previously discerned in the Sterling Act[1] to grant the City of Philadelphia the widest practicable local taxing authority, provided that it does not constructively duplicate a state-imposed tax. That is to say, I agree broadly with the Majority's reaffirmation of the "incidence test" articulated by this Court in *Commonwealth v. National Biscuit Co.*, 136 A.2d 821, 825-26 (Pa. 1957) (hereinafter, "*Nabisco*"[2]). I part ways with the Majority in its conclusion that Philadelphia's Sugar-Sweetened Beverage Tax ("PBT") passes muster under that test. Thus, I respectfully dissent.

In the Sterling Act, our General Assembly stated: "It is the intention of this section to confer upon cities of the first class [*i.e.*, Philadelphia] the power to levy, assess and

---

[1]    *See* Act of Aug. 5, 1932, P.L. 45, § 1, *as amended*, 53 P.S. §§ 15971-73.

[2]    Below, I have occasion to cite a separate decision of this Court involving National Biscuit Co. For clarity's sake, I use *Nabisco* only to refer to our 1957 decision.

collect taxes upon any and all subjects of taxation which the Commonwealth has power to tax but which it does not now tax or license." 53 P.S. § 15971(a). The General Assembly then described and limited this taxing authority as follows:

> [T]he council of any city of the first class shall have the authority by ordinance, for general revenue purposes, to levy, assess and collect, or provide for the levying, assessment and collection of, such taxes on persons, transactions, occupations, privileges, subjects and personal property, within the limits of such city of the first class, as it shall determine, except that such council shall not have authority to levy, assess and collect . . . any tax on a privilege, transaction, subject or occupation, or on personal property, which is now or may hereafter become subject to a State tax or license fee.

*Id.* This Court long has perceived the Sterling Act's grant of taxing authority to Philadelphia to be quite broad, ensuring since the time of the law's Depression-era enactment that Philadelphia has revenue power sufficiently robust to enable it to address the peculiar challenges it faces as our most populous city. *See* Maj. Op. at 10-11 (citing *Nat'l Biscuit Co. v. City of Phila.*, 98 A.2d 182, 185 (Pa. 1953); *City & Cty. of Phila. v. Samuels*, 12 A.2d 79, 81 (Pa. 1940)).

I have no quarrel with this paradigm. But it cannot be stretched to the point that the legislative ban on duplicate taxation is ignored or read out of the law. In nominally levying a tax imposed by volume upon the distribution of sugar-sweetened beverages ("SSBs")[3] for retail sale, the Philadelphia City Council knowingly and intentionally burdened end-consumers of SSBs in what amounts to a tax that duplicates the Commonwealth sales tax upon the same broad category of beverages.[4] The evidence

---

[3] As highlighted by the Majority, this moniker is misleading insofar as the tax applies to certain beverages sweetened by sugar substitutes. *See* Maj. Op. at 2 (citing *Williams v. City of Phila.*, 164 A.3d 576, 579 (Pa. Cmwlth. 2017) (*en banc*); PHILA. CODE § 19-4101(3)).

[4] The details of the considerable overlap between SSBs under the PBT and "soft drinks" as defined by the General Assembly for purposes of excluding them from the sales

lies not only in the text and structure of the PBT itself, but also in the process by which the City considered, drafted, and refined the legislation.

\* \* \* \*

As I dig more deeply into the PBT, I am compelled to greet skeptically the characterization of the PBT as a "distribution" tax in the first instance. The PBT, enacted by dint of the Sterling Act's grant of authority, defines a distributor as "[a]ny person who supplies sugar-sweetened beverage to a dealer." PHILA. CODE § 19-4101(2). A dealer, in turn, is "[a]ny person engaged in the business of selling sugar-sweetened beverage for retail sale within the City." *Id.* § 19-4101(1). However, Section 19-4103 makes clear by its language that the tax in fact is not directed at distribution *as such*. Rather, the tax is imposed upon the following:

> [T]he *supply* of any sugar-sweetened beverage to a dealer; the *acquisition* of any sugar-sweetened beverage by a dealer; the *delivery* to a dealer in the City of any sugar-sweetened beverage; and the *transport* of any sugar-sweetened beverage into the City by a dealer. The tax is imposed only when the supply, acquisition, delivery or transport is for the purpose of the dealer's holding out for retail sale within the City the sugar-sweetened beverage or any beverage produced therefrom.

*Id.* § 19-4103(1) (emphasis added). This broad list of taxable activities—supply, acquisition, delivery, and transport—encompasses by implication distribution in its common sense, but effectively and exclusively captures *any* logistical activity that serves the end goal of retail sale of an SSB.

Notably, Subsection 19-4103(1), the core grant of authority in this putative "distribution" tax, does not even use the word "distribution" or refer by its terms to a

---

tax exemption for certain food items are not essential to my analysis. However, the distinctions may be gleaned by comparing Philadelphia Code § 19-4101(3) with 72 P.S. § 7201(a) (defining "soft drinks") and the "soft drink" exemption from the sales tax exclusion for "food or beverages for human consumption" provided in 72 P.S. § 7204(29).

"distributor."  Nonetheless, the express terms delineating taxable activities ensure that a distributor can be taxed, wherever it is found, wherever its transaction with a Philadelphia dealer occurs.  But when a distributor cannot be taxed, for example because one cannot be identified or has failed to provide the dealer with proof of registration, then the dealer will be.  *See, e.g., id.* § 19-4107(1).  Indeed, no distribution in the conventional sense need occur for the tax to come due.  Rather, by design, the PBT ensures that the levy is imposed once upon every SSB that is held out for retail sale in Philadelphia.  *See, e.g., id.* § 19-4105(3) (protecting against double imposition of the tax upon a "distributor/dealer" under circumstances where "the tax already has been imposed on the supply or delivery of the beverage to the dealer/distributor or the acquisition of the beverage by the dealer/distributor").  While the cost most frequently may be borne by distributors, it applies whether or not a distributor is involved.  Thus, the PBT effectively is tied not to distribution itself, but rather to *any* activity that contributes specifically and exclusively to the supply of SSBs intended for retail sale within the City.

We also must bear in mind the effect of the limitation of the Sterling Act's taxing authority to "persons, transactions, occupations, privileges, subjects and personal property, *within the limits of such city of the first class*."  53 P.S. § 15971(a) (emphasis added).  If the PBT can affect distribution or procurement outside Philadelphia—if, for example, a dealer leaves Philadelphia to obtain SSBs with the intent to transport those SSBs back into the City for retail—it is unclear how that extraterritorial transaction can be taxed under a provision that permits taxation only within the city limits.  In fact, the only understanding of the activity to be taxed that respects and adheres to the statutorily required geographical nexus with Philadelphia is that it applies inexorably to the offering of SSBs for sale at retail in the City.  Thus, for the PBT to be understood consistently with

the Sterling Act's authority, we again must conclude that the tax by design targets retail sales of SSBs.

These textually-driven inferences are difficult to dispute. Moreover, they are reinforced by the history of the drafting, refinement, and enactment of the PBT, and by a review of the process through which SSBs, rather than some other category of retail commerce or economic activity, were selected as the source of the revenue that Philadelphia tapped in order to fund improvements in early childhood education. The City Council was well aware that much of the cost of the tax, wherever in the supply chain it was to be assessed, would be passed through in significant part to the consumer. Indeed, Council's revenue projections incorporated the conservative assumption that sales of SSBs would drop by 55% as a consequence of the tax's expected impact on retail prices.[5] Time and again, in meetings of the Committee of the Whole, Council heard from both citizens and public officials that the PBT would reduce consumption of SSBs and that this would have a salutary effect both city-wide and specifically in and on the very communities that would receive revenues needed to fund new educational opportunities.

Relevantly, at the March 29, 2016 Committee Hearing, the Mayor's Chief of Staff signaled her familiarity with other cities' experiences with the imposition of similar taxes, vis-à-vis whether and to what extent the cost of the tax would be passed on from the

---

[5] *See* Transcript, Hearing on Bill Nos. 160170, 160171, and 160172 Before the Committee of the Whole (hereinafter "Committee Hearing"), 5/3/2016, at 112-13 (testimony of Thomas Farley, Commissioner of Philadelphia's Department of Public Health) (opining that the group estimating PBT receipts assumed a 55% decline in consumption). Limited excerpts of transcripts documenting this hearing and others have been submitted as exhibits to filings in the trial court. We may (and I do) take judicial notice of the full transcripts of these meetings. Transcripts of public City Council committee meetings may be obtained by utilizing the search form located at legislation.phila.gov/council-transcriptroom/transroom_committee.aspx (last reviewed June 6, 2018).

distributor to the consumer. She and the City's Finance Director both attested that, in those other cities, roughly half of the new tax burden reached the consumer.[6] The Mayor's Chief of Staff also underscored the expectation that the tax would affect consumer behavior when she emphasized that "part of the idea is that people will also have a choice to make here and they can change to other beverage consumption."[7] At subsequent meetings, various public comments were received concerning the public health benefits associated with reducing SSB consumption.[8] Indeed, Philadelphia's Public Health Commissioner testified emphatically regarding his Department's support of "[w]hatever is going to reduce that consumption [of SSBs] the most," noting that the communities within which SSB consumption is most prevalent are also those low-income communities that would be most sensitive to increased prices and most likely to reduce consumption in the face of price increases.[9]

---

[6] *See* Committee Hearing, 3/29/2016, at 19 (Chief of Staff Jane Slusser), 20 (Finance Director Rob Dubow).

[7] *Id.* at 24. Chief of Staff Slusser and Finance Director Dubow relied upon the experience of Berkeley, California, following its enactment of a similar tax directed at the distribution of sugar-sweetened beverages. The degree to which the cost of the distribution tax imposed by Berkeley was passed to consumers is taken up at length in a study prepared by the Public Health Institute and the Global Food Research Program of the University of North Carolina at Chapel Hill, attached to the Complaint as Exhibit N. This pass-through question was of particular importance to Berkeley officials, because Berkeley specifically intended to reduce through retail price increases the rate of consumption of SSBs to improve public health.

[8] *See, e.g.,* Committee Hearing: Neighborhood, 4/12/2016, at 23-24 (comments of Barbara Gold, M.D., Philadelphia pediatrician).

[9] Committee Hearing, 5/3/2016, at 92, 93-102 (testimony of Commissioner Thomas Farley).

In a recorded and transcribed April 7, 2016 conversation[10] with Michael Smerconish, Mayor Jim Kenney echoed these themes.  The Mayor made clear that his focus in advancing the PBT was to generate revenue for the various educational programs slated to receive the proceeds of the levy.  Mayor Kenney also acknowledged that a substantial portion of the tax burden would be borne by the consumer.  With respect to the prospect that the tax burden would be passed on, the Mayor stated that, if a consumer is "mad at Jim Kenney because he raised the tax on sugary sweet beverages, [the consumer] can choose not to buy that item."  Interview by Michael Smerconish (April 7, 2016).  Mayor Kenney suggested that the consumer might select a "healthy choice" instead.  *Id.*  The Mayor continued to emphasize the element of consumer choice, and invoked the beverage tax experience of Berkeley, California, where approximately half of the levy's burden had reached consumers.  Confronted with accusations that the tax was a "nanny state" measure, Mayor Kenney responded as follows:

> Well we're not a nanny state.  We're a city with a large poor population that costs us money in many different ways.  If you look at the cost of our prisons, the cost of prosecuting crime, the cost of fighting crime, the cost—*the unreimbursed costs of health issues like diabetes and other things*, we pay in the end anyway.

*Id.* (emphasis added).  Finally, after underscoring the benefits of the universal pre-K opportunities to be funded by PBT revenues, Mayor Kenney again emphasized the "ancillary health benefits which are terrific, if people start drinking less sugar-sweetened beverages."  *Id.*

Thus, speaking generally, the many official and public discussions that occurred during the preparation and enactment of the PBT expressly invoked both the virtues of the educational opportunities to be funded *and* the health benefits to be realized from

---

[10]     The transcript was entered into the record as Exhibit M to the Tax Objectors' Complaint.

deterring SSB consumption, specifically by way of the anticipated pass-through of a portion of the tax burden to the consumer in the form of higher retail prices. Although great consideration was given to the direct beneficiaries of the anticipated tax revenues, attention also was directed to the public health benefit associated with reducing obesity and other conditions caused or exacerbated by consumption of SSBs. Significantly, at various times and in various ways, that benefit was cited to justify taxing SSBs, rather than some other category of commerce or retail item, in order to fund universal pre-K.

* * * *

It is against this legal and circumstantial backdrop that this Court must determine the validity of the PBT. In doing so, we cannot overlook our historically strict approach in construing the scope of the taxing power conferred upon local governments by the General Assembly, in this case by the Sterling Act:

> [I]t is a principle universally declared and admitted that municipal corporations can levy no taxes, general or special, upon inhabitants, or their property, unless the power be plainly and unmistakably conferred. And the grant of such right is to be strictly construed, and not extended by implication. . . . In cases of doubt the construction should be against the government.

*Murray v. City of Phila.*, 71 A.2d 280, 283 (Pa. 1950). The *Murray* Court brought this principle to bear on whether the tax there at issue exceeded the Sterling Act's authorization by amounting to "double taxation of the same thing." *Id.* at 284. This Court noted that, "[i]n determining whether double taxation results, whether the city tax conflicts with that imposed by the state [for Sterling Act purposes], *the practical operation of the two taxes is controlling* as against a mere difference in terminology from time to time employed in describing taxes in various cases." *Id.* (emphasis added).

Our approach to examining whether a new local tax is duplicative under the Sterling Act has remained practical, perhaps to a fault, as illustrated by the Majority's brief

effort to demonstrate how the incidence test brings our disparate case law into harmony, an effort that, unsurprisingly, yields a pointillist account revealing no clear motif. *See* Maj. Op. at 18 n.14 (confessing that "[w]e are under no illusion concerning the intuitiveness and cohesiveness of the decisions in the Sterling Act line on various points.").[11] The acknowledged elusiveness of clear guidance is most evident in this Court's failure long ago to reach even the shadow of consensus in deciding *United Tavern Owners of Philadelphia*, 272 A.2d 868 (1971), the case whose facts most closely resemble those before us today.[12]

These caveats aside, I have no objection to the Majority's first interpretive step, which focuses upon the utility of *Nabisco*'s "incidence test." Echoing *Murray*, the *Nabisco* Court described the test as follows:

> In determining whether a tax duplicates another tax and results in double taxation prohibited to local taxing authorities, the operation or incidence of the two taxes is controlling as against mere differences in terminology from time to time employed in describing taxes in various cases. *The incidence of a tax embraces the subject matter thereof and, more important, the measure of the tax,* i.e.*, the base or yardstick by which the tax is applied*.

---

[11] The Majority's concession in this regard arguably contradicts its later observation that its "determination that the [PBT] survives scrutiny under a plain meaning application of the Sterling Act." Maj. Op. at 22 n.19. The complexity and arguable irreconcilability of past precedent, as well as aspects of my discussion below, strongly suggest that the text of the Sterling Act is anything but a model of clarity.

[12] Justice O'Brien authored the lead opinion, which no justice joined. Chief Justice Bell and Justice Roberts concurred only in the result. Justice Pomeroy filed a dissent in which Justice Eagen joined. Justices Jones and Cohen did not participate in the case. The similarity of *United Tavern Owners* leads the parties to debate at length which of the views expressed in that case should prevail, which prompts the Majority to discuss that 1971 decision at greater length than any other Pennsylvania case. *See* Maj. Op. at 22-23. I discern little if any analytic utility in *United Tavern Owners*, a case that failed to generate any precedential holding. Rather, I believe that we must wrestle with such rules as we can glean from the Sterling Act itself and the principles it embodies, moreso than with our inapposite and non-binding case law on the matter, which offers scant guidance.

*Nabisco*, 136 A.2d at 825-26 (emphasis added). The Majority describes this principle as the "legal incidence" test. In so many words, the legal incidence test asks *what* is taxed and *how* that "it" is taxed.

The Majority distinguishes the legal incidence test from what it calls the "economic incidence" test. The Majority notes that, in *Jon Wanamaker, Philadelphia v. School District of Philadelphia*, 274 A.2d 524 (Pa. 1971), this Court distinguished between the "economic incidence" of a local tax imposed upon the use of commercial and industrial property, which fell upon the property, and the *legal* incidence, which was driven not by the property itself but by its use. Relative to this case, the Majority implies, an economic incidence test would concern itself with whether what appears as a distribution tax in fact amounts to a sales tax—as asserted by the Plaintiff-Objectors herein—because it will be passed through from distributor to retailer to consumer. Citing *Wanamaker* and an unrelated United States Supreme Court opinion, the Majority concludes that the Sterling Act offers no suggestion that Pennsylvania courts should "embark upon such an inquiry into economic incidence for purposes of evaluating the permissibility of local taxes." Maj. Op. at 16.[13]

Taken in isolation, I do not find this argument compelling, but I have no issue with the cautionary approach it embodies. It certainly is true that, if one sufficiently broadens one's focus, one can trace the vast majority of taxes of any kind to the final participant in a given chain of commerce. *Cf.* Maj. Op. at 18 (quoting *Commonwealth v. Neiman*, 84

---

[13]   Neither does the Sterling Act specifically instruct courts to consider the "base or yardstick by which the tax is applied," as *Nabisco* prescribes. *See Nabisco*, 136 A.2d at 826. It also bears noting that, to the extent the legal incidence test relies upon the person or entity upon whom the tax is imposed to distinguish one tax from another, it cannot identify a payor without in some sense engaging in what the Majority calls an "economic incidence" analysis. This is not to say that the downstream effect of a given tax should be dispositive, or even should predominate, in any inquiry of tax sameness. It is merely to suggest that what the Majority treats as a bright-line distinction between economic incidence and legal incidence proves murky in practice.

A.3d 603, 612 (Pa. 2013)) ("[M]atters that are distinct, for instance at a transactional level, can often be described as having a single subject 'if the point of view be carried back far enough.'"). That is to say, for example, that one can make a persuasive argument in the abstract that the income tax burden imposed upon the chief executive of a given soft drink manufacturer has a direct, if miniscule, effect on the price at retail of a can of that soft drink. But merely citing the "legal incidence" approach and calling it a "reasonably bright line standard" does not immunize that test from similar difficulties, especially when one inquires as to "the subject matter" of the tax, which, too, can be described so broadly as to encompass whole swaths of commercial activity or so narrowly as to all but eliminate any practical likelihood that any tax will be deemed duplicative of another, provided they differ in any trivial detail. In either instance, there remains a degree of discretion in the application, a flexibility that can become an unprincipled stain on the governing jurisprudence or, duly restrained, may serve as a tremendous asset in fairly circumscribing a municipality's taxing authority where, as in this case, local duplication of a state tax is verboten.

I am sensitive to the limited utility of an "economic incidence" test. As noted above, applying such a test at a sufficient level of generality would lead one to conclude that virtually any tax Philadelphia might impose would in some sense be duplicative of some other state tax, since every cost of doing business will tend to flow downstream to the end-purchaser. Thus, if that consideration is to enter into our analysis at all, it must be utilized narrowly and with great care. Still, I cannot endorse the Majority's categorical rejection of the relevance of the economic effect of a given tax for purposes of the Sterling Act inquiry, given our oft-repeated concern for the practical *effect* of the tax rather than how it is described or how it nominally operates. Who benefits and who is burdened are essential inquiries in discerning the true nature of any tax. Simply to assert that he who

superficially bears the immediate burden of a given tax is the *only* burdened party, or even the chiefly burdened party, is to undermine our time-honored emphasis upon the practical effects of a given tax. Certainly, who bears the brunt of the tax in the final tally has *some* relevance to the question, even if courts employ that tool with sensitivity to its explanatory limitations.

The Sterling Act limits the taxing authority it confers by denying Philadelphia "the authority to levy, assess and collect . . . any tax on a privilege, transaction, subject or occupation, or on personal property, which is now or may hereafter become subject to a State tax or license fee." 53 P.S. § 15971(a). Plain language strips most of the enumerated categories of taxation of any relevance to this case, leaving us to focus upon the two that remain: whether the distribution "transaction," as such, is impermissibly duplicative of the state sales tax; or, whether the actual "subject" of the distribution tax echoes the "subject" of the state tax. In assessing the import of these terms, we must give distinct effect to each of them. *See* 1 Pa.C.S. §§ 1921(a); *White Deer Twp. v. Napp*, 985 A.2d 745, 760-61 (Pa. 2009) (observing that we must interpret a statute, "if possible, to give effect to all its provisions," requiring us to give each term in a statute independent meaning and effect).

The answer to the "transaction" inquiry is clear: The point of imposition and collection, as well as the measure, of the distribution tax plainly differ materially from the sales tax as applied to retail soft drink purchases. Thus, if there is impermissible duplication, it lies in the conclusion that the PBT and state sales tax, under the instant circumstances, have the same "subject." For present purposes, the question presented is whether the subject of the PBT is, practically, the distribution or retail sale of SSBs.

The Majority relies ultimately on a fairly rigid application of the *Nabisco* rubric, noting the distinction between the putative subject of the PBT (distribution versus retail

sales), the different measures employed to assess each (volume versus a percentage of retail price), and the distinct putative payors of the tax (distributors versus consumers). These, the Majority would conclude, obviate any suggestion that the "subject" of the PBT is duplicative of the "subject" of the sales tax.

Whatever its superficial appeal, I find this analysis wanting in practice. Informed by our continuing emphasis on assessing the defining aspects of a tax by how it actually *operates* in the world, I am compelled to conclude that the true and intended *subject* of the PBT is, and has always been, the retail purchase and consumption of SSBs. To find otherwise is to insist that, in knowingly deterring the purchase of soft drinks by effectively ensuring *some* increase in the retail price, it was merely the curtailment of their distribution that the Council actually effectuated and intended. This neat conclusion is one that the text of the PBT cannot bear and in fact does not sustain, given how quickly that text wanders afield of that particular commercial function (*i.e.*, distribution) whenever it must in order to ensure that not a single drop of SSB is sold at retail within the jurisdiction without first paying the prescribed assessment. To make sense of the intended reduction in consumption coupled with the raising of revenue upon the backs of the end-purchasers, which the City Council so certainly anticipated that it built that reduction into its calculations, the distribution point must have been understood merely as where the tax would be imposed for administrative purposes (with the ancillary benefit that it would furnish Council the best chance of avoiding Sterling Act invalidation).[14] Nor is it

---

[14] The Majority endorses the United States Supreme Court's concern, stated in *Oklahoma Tax Commission v. Chickasaw Nation*, 515 U.S. 450 (1995), that, "if we were to make 'economic reality' our guide, we might be obligated to consider, for example, how completely retailers can pass along tax increases without sacrificing sales volume—a complicated matter dependent on the characteristics of the market for the relevant product." Maj. Op. at 15 (quoting *Chickasaw Nation*, 515 U.S. at 459-60). Respectfully, while this may present an intractable problem in another case, I disagree that it establishes the necessity of a categorical exclusion of such considerations, especially

persuasive to find a dispositive distinction in the method of calculation—volumetric versus price-driven. In either case, revenues raised and consumption deterred are fundamentally and inextricably responsive to the volume of SSBs purchased at retail.

Simply put, I do not find the Majority's effort to find the safe harbor of clarity in the bright-line of the "legal incidence" test reconcilable with a test requiring the assessment of a tax's *practical effect*. Indeed, speaking generally, I find irreconcilable the very notions of a practical inquiry and a bright-line test, and I discern no substantive benefit in this context to abandoning our long-standing if messier approach to such questions. For this reason, I find it incongruous to imply, as the Majority does, that we cannot seek a given levy's "legal incidence" by looking beyond nomenclature to focus upon its foreseen, and even intended, effects—regardless of whether that entails some consideration of economic effects. The "subject" of the PBT is SSB consumption at retail. The only way to find otherwise is to indulge the convenient fiction of calling the PBT a distribution tax, despite the fact that the levy does not even use that terminology in the critical passage and despite the fact that the PBT suggests no concern for whether it actually is levied on distribution as such, but only the concern that no SSB intended for retail sale eludes its grasp.

The Council and the Mayor, guided in part by officials and experts who anticipated and saw social good in reducing the consumption of SSBs, enacted the PBT to realize the dual benefits of funding universal pre-K education and improving public health. Although the PBT's advocates often foregrounded the educational benefits, they treated

_____

where, as here, the text of the ordinance as well as the record so clearly reflect a conscious concern for, and arguably the desire for, the trickling down of the PBT's levy to the retail consumer. It is implicit in *any* practical inquiry that its scope and contour are case-specific. It seems to me uncontroversial that a particular economic consideration which a court finds germane in one case may be too problematic or ill-fitting to incorporate into the court's analysis in a different case.

as complementary, rather than merely incidental, the public health benefits associated with substantial reductions in SSB consumption, which they anticipated would manifest disproportionately in the very same communities that would receive the lion's share of the PBT revenues collected. Nowhere is it suggested that they treated this as a happy accident. Nor should we. The Sterling Act provided sufficient authority for Council to generate new revenue by any number of means—and the political actors behind the PBT selected SSBs as the most suitable. We would unmoor Council's choice, as embodied in the text of the PBT and reinforced by the process of its development and enactment, from its full context were we to pretend that deterring SSB consumption was merely incidental. I do not discern how we may indulge this fiction. The only conventional mechanism to deter consumption is to increase the effective retail cost of SSBs. By imposing a substantial tax specifically upon SSB "distribution," Council literally banked on that effect.

It elevates form over substance to grant Philadelphia the benefit of its self-serving description, when to do so obscures the tax's foreseeable and intended effect—one that the Mayor and Council, in fact, *studied* in gauging the prudence and effectiveness of an SSB tax in the first instance, one that was designed to affect *all* avenues by which a can of cola might arrive in a bodega cooler. Furthermore, to split hairs based upon Philadelphia's chosen characterization confounds our time-honored interpretive presumptions, which unerringly favor the putative taxpayer when the scope of a tax-authorizing statute is in question.

I am sensitive to the challenges facing cities seeking to finance their own needs, especially given the limited degree to which funds flow from state coffers to address those needs. Furthermore, I am mindful that, in answer to this difficulty, the General Assembly with the Sterling Act long ago invited Philadelphia to finance its own initiatives by

collecting revenues from those who live and do business within the city limits. But the Sterling Act's grant of broad taxing authority is not absolute, and it specifically precludes Philadelphia from piggybacking on extant state taxes. The General Assembly has seen fit to impose a sales tax on certain goods, including a class of beverages that overlaps heavily with SSBs. In imposing a tax that foreseeably would be borne in substantial part by the retail purchaser, the City of Philadelphia knowingly stacked the PBT upon the state sales tax, and in so doing duplicatively taxed retail trade in soft drinks, a "subject" already burdened by the state sales tax. For these reasons, I believe we are bound to find that the PBT impermissibly imposes upon the state sales tax in violation of the Sterling Act.

A rose by any other name smells just as sweet, and, whether styled a retail tax or a distribution tax, the levy here at bar, like the state sales tax, raises revenue specifically by burdening the proceeds from the retail sale of sugar-sweetened beverages. This the Sterling Act does not allow. I respectfully dissent.